**UNITED STATES of America**

v.

**Charles GRIMES.**

**No. 99–CR–6027.**

United States District Court,
W.D. New York.

Aug. 18, 1999.

---

Bret Puscheck, Assistant United States Attorney, Rochester, NY, for the United States of America.

William Clauss, Federal Public Defender, Rochester, NY, for the Defendant.

## DECISION and ORDER

SIRAGUSA, District Judge.

Indictment number 99–CR–6027 was filed against the defendant on April 6, 1999, charging him with three counts, all in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). The defendant brought a Notice of Motion dated June 2, 1999 seeking various forms of relief. The Government filed a response dated June 18,1999 in opposition to the defendant's motion. The Court heard oral argument on June 21, 1999, after which two matters remained outstanding. The first involved the defendant's request for a hearing on Project Exile, the prosecutorial initiative pursuant to which the United States Attorney brought the case. The Court reserved on this application. The second, involved the defendant's motion to suppress physical evidence that was seized as a result of two searches conducted at the defendant's residence following his arrest on a parole warrant. In regard to this matter, the Court held a hearing on July 7, 8, and 23 of 1999. For the reasons to be stated, both of the defendant's outstanding applications are denied.

### PROJECT EXILE

■ The Project Exile program, which was initiated here in Rochester in September of 1998 and which is modeled after a similar program in Richmond, Virginia, is a result of the collaboration of several state and local law enforcement agencies, including the Monroe County District Attorney's Office, the Rochester Police Department, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearms, the United States Marshal's Service, the New York State Police, the Monroe County Sheriff's Department, the Monroe County Chiefs of Police, and the United States Attorney's Office. The stated purpose of the Project Exile program is to federally prosecute firearms-related crimes in order to take advantage of federal pre-trial detention and sentencing statutes. The defendant contends that Project Exile may violate his constitutional guarantee of equal protection under the law. As to this equal protection argument the defendant, who is an African–American, relies on three grounds. First, he suggests that he will likely be tried by a jury drawn from a population with a greater proportion of non-African-American people than he would be if prosecuted in State court. Accordingly, he moved for inspection of jury lists as an initial step in establishing this claim, and requested leave to supplement his jury composition argument after inspection of jury records. Although the Court granted the defendant access to the Master and Qualified jury wheels on July 21, 1999, the defendant has been unable to support his suggestion that the jury selection process in federal court is constitutionally infirm with any type of proof. Therefore, to the extent that the defendant is seeking any type of relief on this equal protection ground, it is denied.

■ The second ground advanced by the defendant is that Project Exile violates the Fifth Amendment prohibition against selective prosecution based on race. In this regard, the defendant attempts to show, through the use of statistics, that similarly-situated individuals are treated differently. Specifically, the defendant states that since January 1, 1998, twenty-seven of the thirty-three defendants the Federal Public Defender's Office has been assigned to represent on gun-related charges are African–American. To demonstrate that similarly-situated individuals of a different race have been treated differently, the defendant cites five cases where white gun offenders were not diverted from state court to federal court for prosecution, and suggests upon informa-

tion and belief (without stating the sources of such information and belief), that other examples of non-African-American defendants being prosecuted in state court rather than federal court, exist. Based upon these allegations, the defendant requests a hearing, so he can subpoena witnesses and documents to support his claim. However, to be entitled to the relief he seeks, the defendant must make a credible showing that some evidence exists which tends to show, one, that similarly-situated individuals of a different race were not prosecuted and, two, that the decision to prosecute him was invidious or in bad faith. *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). The Court finds that the statistics cited by the defendant do not amount to the requisite credible showing that similarly-situated individuals of a different race were not prosecuted. See *United States v. Fares,* 978 F.2d 52, 59 (2d Cir. 1992). Even assuming, *arguendo,* that the statistics advanced by the defendant constituted sufficient evidence of discriminatory effect, the defendant fails to offer any evidence of discriminatory intent. Consequently, the defendant's application for a hearing, based on selective prosecution is denied.[1]

■ The third equal protection ground advanced by the defendant is one of disparate impact. Specifically, the defendant contends that by targeting the City of Rochester for its Project Exile initiative, the Government has, in effect, targeted African–Americans for prosecution. The relief the defendant seeks is a hearing on this claim as well. However, to be entitled to this relief, the defendant must not only demonstrate that the prosecutorial initiative has a disparate impact, he must also show racial animus or disparate treatment. In other words, a prosecutorial initiative, such as Project Exile, may legitimately "target a certain activity for enforcement,

even if that activity is primarily engaged in by members of one race, without necessarily violating the Constitution's guarantee of equal protection." *United States of America v. Jones,* 36 F.Supp.2d 304, 312 (E.D.Va.1999). Even if the Court were to accept the defense position that, based on 1990 Census Data, Project Exile disproportionally impacts African–Americans, the defendant has failed to come forward with any evidence regarding racial animus or disparate treatment. Therefore, the defendant's motion for a hearing on the ground of disparate impact is also denied.

## SUPPRESSION OF TANGIBLE ITEMS

As indicated above, two searches of the defendant's residence occurred following his arrest on a parole warrant on January 12, 1999. It is the defense position that both searches were unlawful, since no warrant had been issued and no exception to the warrant requirement existed to justify a warrantless search. At the commencement of the evidentiary hearing, the Government contended that the first search, which was limited to the defendant's bedroom, was proper as incident to a lawful arrest, or alternatively, valid under the rules and regulations of the New York State Division of Parole, which permit the search of a parolee's residence at any time. The Government further maintained that the second search, which included the defendant's entire residence, was lawful based on consent.

However, as the hearing progressed, the Government changed its position as to the first search of the defendant's bedroom. The undisputed facts established at the hearing were at odds with the Government's initial position that the search was incident to a lawful arrest. Moreover, based on the Court's research, it became

---

1. In reaching its determination as to the second and third grounds of the defendant's equal protection argument, the Court relies on the well-reasoned decision of Magistrate Judge William G. Bauer of the Western District of New York rendered in the case of *United States v. Ludlow Brown and Tenloy Patterson,* 99–CR–6006T, decided August 4, 1999.

apparent that the Government's alternate theory, that the New York State Division of Parole had *carte blanche* authority to search the defendant's residence, was at odds with both federal and state law. Nonetheless, as explained below, the Court finds that both the first search of the defendant's bedroom, and the second search of his entire residence were lawful.

## FINDINGS OF FACT

The Court, having had a chance to consider the evidence presented at the hearing, including the testimony of all the witnesses called to the stand, as well as the exhibits received, and the Court having made determinations on issues of credibility, now makes the following findings of fact.

On January 12, 1999, the defendant, Charles Grimes was a parolee with the New York State Division of Parole assigned to the Rochester, New York Office. In this regard, on May 16, 1996, the defendant had signed a Certificate of Release to Parole Supervision in which he acknowledged certain conditions of release, including the following:

4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property.... [2]

6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement agency. I understand that I have a continuing duty to notify my Parole Officer of such contact or arrest.

As of January 1999, Grimes was living at 37 Linnet Street in the City of Rochester. His parole officer at the time was Cynthia Mooney. On January 11, 1999, the defendant had called Mooney to inform her that he had contact with members of the Rochester Police Department twice the preceding week for operating a motor vehicle without a license. However, the next day Mooney spoke to Sgt. Mark Mariano, the coordinator of the Clinton Section of the Rochester Police Department. Mariano told Mooney that the defendant was a suspect in numerous robberies. In particular, he mentioned to her a robbery of a beer delivery truck involving the use of a hand gun in which the driver of the truck had been assaulted. Mariano further reported to Mooney that the defendant's vehicle had been observed leaving the scene of the incident. Mooney also learned that when the defendant's vehicle was stopped by the police, it was searched, and while no gun was found, a ski mask was discovered, and that the defendant had been arrested and taken into custody. Mooney then conferenced the matter with Senior Parole Officer Philip Overfield. Additionally, Mooney advised Overfield that the defendant was in violation of the terms and conditions of his parole due to positive drug tests, noncompliance with drug treatment, and the failure to attend an educational program. As a result of the conference, a violation of parole warrant was issued by Overfield, with the understanding that it should be executed as soon as possible.

Pursuant to the warrant, Mooney and other members of the New York State Division of Parole, including Parole Officers Rustowicz, Messinger, and Bratek went to 37 Linnet Street at about 2:30 p.m. on January 12, 1999. It was Mooney's understanding that the defendant was living there with his mother, Pearl Davis, and his sister, LaTayna Grimes, along with her two children. Upon arriving at 37 Linnet Street on January 12, 1999, Mooney observed LaTayna Grimes outside on her way back into the residence with a small dog. LaTayna Grimes was asked if the defendant was home, at which time she

---

**2.** It is clear in New York that this authorization can not "be taken as an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures." *People v. Huntley,* 43 N.Y.2d 175, 182, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977).

slammed the door stating "you can have him." A short time later, LaTayna Grimes returned to the front door yelling to Mooney and the other parole officers that they could have Grimes, but they weren't going to come into the home, threatening them with a rottweiler. In response, the Rochester Police Department was radioed for assistance. However, prior to members of the Rochester Police Department arriving, the front door opened slightly and the defendant squeezed through with his back facing the street and with his hands behind his back. Rustowicz promptly placed Grimes in handcuffs and pulled him out of the doorway. At the same time, Mooney placed her hand on the door and became involved in an altercation with LaTayna Grimes, which resulted in Ms. Grimes slamming the door shut.

A few minutes later, an officer from the Rochester Police Department's Canine Unit arrived and LaTayna Grimes was asked to step out onto the porch. She did so and was placed under arrest for Obstructing Governmental Administration. Rustowicz, Messinger and the Rochester Police Department canine officer then stepped into the house with Ms. Grimes, at which point the canine officer secured the rottweiler. Once inside the house, Rustowicz and Messinger told LaTanya that they had authorization to search the defendant's room, but wanted her cooperation to search the rest of the house. LaTayna Grimes, at that time, indicated that she wasn't the main renter, that her mother was, and that the officers would have to wait until her mother came home to search the rest of the house. Rustowicz and Bratek then searched the defendant's bedroom and found a duffel bag under the bed which contained two magazine clips, a bulletproof vest, walkie-talkies, and what appeared to be a mask. They also found an electronic digital scale in a drawer in the dresser, and three portable scanners near the foot of the bed. At that time the only room searched was Grimes' bedroom.

Following this initial search of the defendant's bedroom, his mother, Pearl Davis also known as Pearl Santiago, arrived at 37 Linnet Street. Investigator William McGlynn of the Rochester Police Department introduced himself and explained to her that because of what was found in her son's bedroom, there was a concern that there might be guns in the home. Davis told Investigator McGlynn that she lived there, and when he asked if the police could search the home for guns, she gave her permission. Investigator McGlynn then, at about 3:56 p.m., produced a written consent to search form, which he filled in and read out loud to her. After Investigator McGlynn read the form out loud to Ms. Davis, she signed it, and he witnessed it. Investigator McGlynn did not make any threats or promises to get Ms. Davis to sign the form, and at the time she signed, she did not appear to be injured, or under the influence of alcohol or drugs. Thereafter, a second search was conducted of the entire residence at 37 Linnet Street. In the course of the second search, Officer Geoff Waiter of the Rochester Police Department found, in what appeared to be a child's playroom, a knapsack located under a blanket on top of a toy box. He looked inside the knapsack and observed a black hand gun and a roll of duct tape. In the course of the second search, additional items were discovered in the defendant's bedroom. These consisted of a pellet gun wrapped in electrical tape located in a bag inside the closet and a laser site. Additionally, a duffel bag containing camouflage pants, gloves, and a bulletproof vest was found in the attic. Another bulletproof vest was found on or near this duffel bag.

## ANALYSIS

While a parolee does not generally surrender his constitutional rights against unreasonable searches and seizures, his status as a parolee is nonetheless relevant in any evaluation of the reasonableness of a particular search or seizure. That is, what may be unreason-

able with respect to an individual who is not on parole, may be reasonable with respect one who is. *United States, ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216, 1218 (2d Cir. 1971). In this regard, an individual's status as a state parolee may diminish his Fourth Amendment protection from intrusion by his parole officer, since a state's operation of its parole system presents special needs, beyond normal law enforcement, that may justify departure from the normal probable cause and warrant requirements. *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). That such diminished protection may be reasonable is founded in the dual function of parole: one, to guide the parolee into constructive development and to help him achieve proper reintegration into the community; and two, to prevent parole violations for the protection of the public. *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir.1984). Whether a specific parole search, undertaken without a warrant on less than probable cause, is valid depends on whether it meets the requirements of state law or regulation, and whether the state law or regulation itself complies the reasonableness mandate of the Fourth Amendment. *Griffin v. Wisconsin*, 483 U.S. at 872–873, 107 S.Ct. 3164.

■ In New York the subject of a parolee's diminished rights under the Fourth Amendment has been addressed, in the first instance, not by regulation, but by case law.[3] In *People v. Huntley*, 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977), the New York Court of Appeals held that a parolee's constitutional right to be secure against unreasonable

searches and seizures is not violated by a warrantless search by his parole officer if the latter's conduct is rationally and reasonably related to the performance of his duty as a parole officer.[4] The Court specifically finds that New York's operation of its parole system presents special needs which render the above-stated standard reasonable under the Fourth Amendment.

■ Next, the Court finds that both the first search of the defendant's bedroom and the second search of his entire residence were in accord with the *Huntley* decision. When Officer Mooney and other members of the New State Division of Parole went to 37 Lynette Street, on January 12, 1999, they had reasonable suspicion to believe that the defendant was in violation of parole, and the searches conducted were rationally related to their responsibility both to the parolee and to the community. Not only did they have in their possession a parole warrant for his arrest, but they were aware that he had testified positive for drugs, and they had information from the Rochester Police Department that he was a suspect in a number of robberies and was believed to be in possession of a gun. Moreover, the defendant was currently on parole for Robbery in the First Degree. Consistent with the dual functions of parole, Officer Mooney and the other members of the New York State Division of Parole had both the authority and obligation to conduct a search not only of the defendant's room, but of the entire residence at 37 Linnet Street to determine if he was violating his parole, either with respect to drug usage or gun possession and involvement in robberies. *See, Griffin v. Wisconsin*, 483 U.S. at 878–880, 107 S.Ct. 3164; *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 72 L.Ed.2d 572

**3.** It is of course well-settled that federal courts must take judicial notice of the case law of each of the states. *Lamar v. Micou*, 114 U.S. 218, 223, 5 S.Ct. 857, 29 L.Ed. 94 (1885).

**4.** The Court notes that this standard relating to parole searches has been incorporated by

the New York State Division of Parole into its Policy and Procedures Manual (September 1996), Section II.A. However, since the Government did not introduce the manual into evidence, the Court does not consider this provision in rendering its decision.

(1982); *United States v. Giannetta,* 909 F.2d 571, 576–77 (1st Cir.1990).

The Court therefore concludes that the items seized from 37 Linnet Street on January 12, 1999, in both the first and second searches, were lawfully seized. The fact that members of the Rochester Police Department assisted the New York State Division of Parole in conducting the second search, and the fact that it was Officer Waiter of the Rochester Police Department who discovered the knapsack containing the handgun, does not in any way invalidate this conclusion. The Court finds, as a matter of law, that the New York State Division of Parole was not acting as a "stalking horse" for the Rochester Police Department in conducting the search at 37 Linnet Street on January 12, 1999. *United States v. Watts,* 67 F.3d 790, 793 (9th Cir.1995), *rev'd on other grounds,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

Alternatively, the Court finds that the second search conducted at 37 Linnet was proper based on the oral and written consent of Pearl Davis. First, the Court finds that the Government has established by a preponderance of the evidence that based on the statements of LaTayna Grimes and Pearl Davis, as set forth in the Findings of Fact above, that it was reasonable to believe that Pearl Davis had authority over the premises. *Illinois v. Rodriguez,* 497 U.S. 177, 187, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Second, the Court finds by a preponderance of the evidence, based on the totality of circumstances, that the consent to search by Ms. Davis was voluntarily given and not the product of duress or coercion. *United States v. Kon Yu–Leung,* 910 F.2d 33, 40 (2d Cir.1990).

## CONCLUSION

Accordingly, the defendant's applications for the suppression of tangible evidence and for a hearing on Project Exile [Document 17] are denied.

IT IS SO ORDERED.