**UNITED STATES of America,**
**Appellee,**

v.

**Charles GRIMES, Defendant–**
**Appellant.**

**No. 00–1152.**

United States Court of Appeals,
Second Circuit.

Argued: Aug. 9, 2000

Decided: Aug. 21, 2000.

Bradley E. Tyler, Assistant United States Attorney (Denise E. O'Donnell, United States Attorney for the Western District of New York) Rochester NY, for Appellee.

William Clauss, Federal Public Defender's Office (Jay S. Ovsiovitch, research and writing specialist) Rochester, NY, for Defendant–Appellant.

Before: CALABRESI, CABRANES, and POOLER, Circuit Judges.

PER CURIAM.

Defendant-appellant Charles Grimes appeals from a judgment of the United States District Court for the Western District of New York (Charles J. Siragusa, *Judge*), upon Grimes's plea of guilty to charges of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). Grimes asks that we reverse the district court's finding that searches of his residence at 37 Linnet Street in Rochester, New York on the day of his arrest did not violate his Fourth Amendment rights. He also asks that we reverse the district court's denial of his motion to with-

draw his guilty plea and that we find the district court's application of sentence enhancements under United States Sentencing Guidelines § 2K2.1(b)(5) and § 3C1.1 erroneous.

## BACKGROUND

On May 23, 1991, defendant Charles Grimes was convicted of robbery in the first degree in Monroe County Court in Rochester, New York. After serving his sentence for this crime, Mr. Grimes was released from the Oneida Correctional Facility in May 1996 and was assigned to the supervision of Parole Officer Cynthia Mooney in January 1998. On January 11, 1999, Grimes got in touch with Mooney and informed her that he had had contact with the police on January 7 and January 9.[1] Grimes explained to Mooney that on both occasions he was ticketed for operating a motor vehicle without a license but that he had not been taken into custody. On January 12, 1999, Mooney was called by a Rochester Police officer who provided more information about Grimes's run-in with the police. Mooney was told that Grimes fled from the police when they attempted to pull over his vehicle, that he was later taken into custody, and that he was suspected of being involved in numerous robberies and of possessing a gun. She was told that a ski mask was discovered in Grimes's car after he was pulled over and that he had been arrested and released on January 11, 1998.

Mooney then discussed Charles Grimes's parole status with her superior, Parole Officer Phillip Overfield, and noted that Grimes was not in compliance with the conditions of his parole due to positive drug tests, failure to comply with the conditions of a drug treatment program, failure to attend a required education program, and lying to his parole officer about his contact with the police. The parole officers issued a Violation of Parole Warrant and decided to execute it "as soon as possible."

On January 12, 1999, at approximately 2:30 p.m., Parole Officer Mooney and five other parole officers went to Charles Grimes's residence at 37 Linnet Street in Rochester in order to execute the warrant. Upon arriving at the Grimes residence, the officers encountered LaTonya Grimes, the defendant's sister, on the front lawn. Ms. Grimes immediately entered the house, slammed the door shut, and locked it. She told the officers that she would get Charles for them and that they "could have him." Over the next five to eight minutes, the parole officers "heard a great deal of walking around upstairs, loud thumping, [and] music ... turned up very loud." Ms. Grimes yelled to the officers that her brother would be coming out, but that the officers would not be permitted to enter the house. She warned the officers that she had a Rottweiler and that she would set the dog on them if they tried to come in. The parole officers called the Rochester Police Department ("RPD"), informed them that they had a warrant for Mr. Grimes's arrest but were being met with resistance, and requested assistance.

Later, but before the Rochester police arrived on the scene, the front door to 37 Linnet Street opened partially and Charles Grimes began to squeeze out with his back to the parole officers and his hands behind his back. Mooney put her hand on the front door and attempted to push it open in order to assure that the officers were secure. Specifically, she was concerned that there might be someone inside with a gun. LaTonya Grimes grabbed Mooney's wrist while trying to keep the front door closed and to push Charles outside. She insisted that the officers not enter. Mr. Grimes was taken into custody in the doorway of 37 Linnet Street. The door was slammed shut behind him.

---

1. As a condition of his parole, Grimes was required to report all contact with police to his parole officer.

Soon after, officers from the RPD arrived, and, at Mooney's request, arrested LaTonya Grimes for obstructing governmental administration. Parole officers then searched Charles Grimes's bedroom only. The officers there found a bulletproof vest, three portable scanners, two rifle magazines (one with live rounds in it), an electronic digital scale, a ski mask, two walkie-talkies, and a pellet gun. The parole officers asked LaTonya Grimes for permission to search the entire house. She refused, insisting that the police would have to wait until her mother, the "main renter," returned home.

Charles Grimes's mother, Pearl Davis (also "Pearlean Santiago") arrived at 37 Linnet Street at approximately 3 p.m. on January 12, 1999. At about 3:30 p.m. Rochester police officer William T. McGlynn arrived at the Grimes residence and explained to Ms. Davis that he wanted her consent to search the entire house because the police had reason to believe that there were guns in it. Officer McGlynn explained the consent form to Ms. Davis and read it to her. Ms. Davis gave police officers both oral and written consent to search the entire premises. During the search, police and parole officers found two handguns, flex cuffs, conventional handcuffs, duct tape, live ammunition, camouflage fatigue clothing, two bulletproof vests, drug baggies, and a laser point sight system.

On April 6, 1999, Charles Grimes was indicted under 18 U.S.C. § 922(g)(1) and § 924(a)(2) on three counts of being a felon in possession of firearms and ammunition. Mr. Grimes moved to have the evidence that had been seized from 37 Linnet Street suppressed on the grounds that the warrantless searches were unlawful. Judge Siragusa held a suppression hearing on July 8, 9, and 23 and then denied defendant's motion. *United States v. Grimes,* 67 F.Supp.2d 170 (W.D.N.Y.1999).

In his decision and order, Judge Siragusa noted that while parolees do not surrender their constitutional protection from unreasonable searches and seizures, their status as parolees diminishes the extent of their Fourth Amendment protection. He explained that under New York law, parolees may be subject to warrantless searches and seizures by a parole officer as long as the officer's conduct is rationally and reasonably related to the performance of his or her duties. *Id.* at 176–77 (citing *People v. Huntley,* 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977)). Judge Siragusa found that this standard comported with the requirements of the Fourth Amendment and that the original search of defendant's bedroom as well as the subsequent search of the entire house were permissible under *Huntley.*[2] The district court also held, in the alternative, that the second search conducted at 37 Linnet Street was lawful, given the consent of Pearl Davis.

On September 24, 1999, a little more than one month after the district court denied his motion to suppress, Charles Grimes executed a plea agreement with the U.S. Attorney's office and pled guilty to all of the counts of the indictment.

On February 8, 2000, Mr. Grimes filed a motion to withdraw his plea. In a signed and sworn affidavit attached to his motion, Grimes claimed innocence and explained that he pled guilty only to spare his family the trauma of seeing him put to trial. He also urged that his decision to plead guilty was motivated by distrust of the criminal justice system, which had been encouraged by his mother and sister.

At Mr. Grimes's sentencing hearing, on February 14, 2000, Judge Siragusa denied the defendant's motion to withdraw his plea, finding no "fair and just reason" for

2. Judge Siragusa also determined that the parole officers were not serving as a "stalking horse" for the RPD by executing a warrant for parole violation in order to gain access to the premises at 37 Linnet Street and collecting evidence that might incriminate Grimes. *Grimes,* 67 F.Supp.2d at 177.

doing so. Based on the evidence adduced at the suppression hearing and at Grimes's plea colloquy, the court found "no valid grounds for withdrawal."

The district court then set the defendant's offense level under the United States Sentencing Guidelines. Grimes's offense level was adjusted in light of U.S.S.G. § 2K2.1(b)(5) and U.S.S.G. § 3C1.1. Specifically, Judge Siragusa enhanced Grimes's offense level by 4 points under the former provision, which requires a finding that the defendant was in possession of a firearm or ammunition with reason to believe that it would be used in the commission of a felony. Applying the latter provision, the district court enhanced the defendant's offense level by two more points for obstruction of justice, concluding that Grimes perjured himself by claiming innocence in the affidavit accompanying his motion to withdraw his plea. Grimes was sentenced to 120 months in prison.

This appeal followed.

## DISCUSSION

The Supreme Court has explained that "[a] State's operation of a probation system ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin v. Wisconsin*, 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). As a result, probationers may be subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875, 107 S.Ct. 3164. Still, such impingements must occur "pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement." *Id.* at 873, 107 S.Ct. 3164.

■ Though this case involves searches of a parolee, and not, as in *Griffin*, a probationer, we hold that, like probation, parole justifies some departure from traditional Fourth Amendment standards. *Cf. United States v. Cardona*, 903 F.2d 60, 63 (1st Cir.1990) *cert. denied*, 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991) ("The first of these differences—that Cardona was on parole whereas Griffin was on probation—cuts in favor of the government. Parole is meted out in addition to, not in lieu of, incarceration.... On the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.") (internal quotation marks and citation omitted). We must, therefore, assess New York's search regulations for parolees "as [they have] been interpreted by state corrections officials and state courts," *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164, and, using this interpretation, we must determine whether the special needs attendant to the operation of New York's parole system justify their departure from traditional Fourth Amendment principles. *Id.* at 876, 107 S.Ct. 3164. We conclude that they do.

The New York Court of Appeals has explained that "whether [a parole search] was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty."[3] *People v. Huntley*, 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 371 N.E.2d 794

---

3. Defendant picks up on the fact that this rule was created by the state courts and stresses that "the search [in this case] was not done pursuant to any state regulation." The *Griffin* opinion, however, draws no such distinction between legislatively–and judicially–crafted rules. *See United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir.1990) ("[W]e do not read *Griffin* as approving only probation searches conducted pursuant to a legislative or administrative framework."). Further, we can see no reason to distinguish between legislatively–and judicially–crafted search rules for these purposes. The critical question, for Fourth Amendment purposes, is whether the regulation contains a reasonableness requirement (or some more stringent standard); it is not which branch of Government generated the rule.

(1977). On the facts before us, we find no evidence that "either the New York State rules specified in *Huntley,* or the searches conducted in this case, are inconsistent with the Fourth Amendment."[4]

■ The defendant also argues that the parole officers in this case served as a "stalking horse" for the Rochester Police Department by using their ability to conduct warrantless searches to gather evidence for the police which the RPD, lacking probable cause, could not obtain. Some Circuits have held that searches conducted by parole officers who behave as a "stalking horse" for police are unlawful. *See e.g., United States v. McFarland,* 116 F.3d 316, 318 (8th Cir.1997), *cert. denied,* 522 U.S. 961, 118 S.Ct. 394, 139 L.Ed.2d 308 (1997); *Shea v. Smith,* 966 F.2d 127, 132 (3d Cir.1992); *United States v. Harper,* 928 F.2d 894, 897 (9th Cir.1991); *Cardona,* 903 F.2d at 65. On the facts of this case, however, the conduct of the police was clearly proper. They informed Grimes's parole officer of what were, on their face, seeming violations of his parole. Therefore, without deciding the question of whether a "stalking horse" defense exists, or what its dimensions might be, we find no basis for it on the facts before us.

■ All of the other issues in this case can be decided summarily. The district court's rejection of Grimes's motion to withdraw his guilty plea is reviewed for abuse of discretion. *United States v. O'Hara,* 960 F.2d 11, 14 (2d Cir.1992). Rule 32(e) of the Fed.R.Crim.P. indicates that a court may permit withdrawal of a guilty plea "if the defendant shows any fair and just reason for doing so." Still, "[a] defendant has no absolute right to withdraw his plea of guilty." *United States v. Williams,* 23 F.3d 629, 634 (2d Cir.1994), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994). "The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea." *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992). "In determining whether a 'fair and just reason' exists to justify withdrawal of a guilty plea, a district court should consider: (1) the time lapse between the plea and the motion; and (2) whether the government would be prejudiced by a withdrawal of the plea." *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) (citations omitted). The defendant bears the burden of showing that there are valid grounds for permitting withdrawal. *United States v. Rodriguez,* 968 F.2d 130, 141 (2d Cir.1992), *cert. denied,* 506 U.S. 847, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992).

■ Almost five months passed between the date of Grimes's guilty plea and his first indication that he wished to withdraw it. His motion for withdrawal is predicated on the contentions that (1) he is innocent, (2) he pled guilty only to protect his emotionally brittle mother and sister from the trauma of seeing him stand trial, and (3) his guilty plea was motivated by a distrust of the criminal justice system fomented by his mother and sister. None of these arguments is persuasive, and the district court was well within its discretion in deciding to reject Grimes's motion.

Application of the four-level sentence enhancement pursuant to U.S.S.G. § 2K2.1(b)(5) is well supported on the record. The district court misspoke once in stating what the standard for application of this sentence enhancement is, but in view of the fact that the court articulated the standard correctly on two other occa-

---

**4.** Indeed, the New York rule is coextensive with the requirements of the Fourth Amendment. A rule indicating that a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties is identical to a rule that parole officers may conduct searches so long as they comport with the Fourth Amendment. This is because the doctrine of "special needs," *Chandler v. Miller,* 520 U.S. 305, 313–14, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), permits those searches that are reasonably related to the special needs animated by management of a parole system.

sions, Judge Siragusa's error was undoubtedly just a slip of the tongue. In any event, the evidence that a four-level enhancement was required was so strong that any error would be harmless.

Similarly, though the standards for a sentence enhancement for obstruction of justice through perjury on the part of a defendant are fairly stringent, *United States v. Gabriel,* 125 F.3d 89, 105 (2d Cir.1997) (requiring clear and convincing evidence), the district court certainly did not commit clear error in finding that those standards were met here.

\*    \*    \*

The judgment of the district court is AFFIRMED.