10-3700-cr
United States v. Barner

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2011

(Argued: October 3, 2011     Decided: January 13, 2012)

Docket No. 10-3700-cr

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

—v.—

JIMMY LEE BARNER,

*Defendant-Appellee*.

————————————

Before:

SACK, RAGGI, *Circuit Judges*,

and EATON, *Judge.*[*]

————————————

Interlocutory appeal from a suppression order entered in the United States District Court for the Western District of New York (William M. Skretny, *Judge*).

REVERSED AND REMANDED.

---

[*]     Judge Richard K. Eaton of the United States Court of International Trade, sitting by designation.

JOSEPH J. KARASZEWSKI, Assistant United States Attorney, *Of Counsel*, *on behalf of* William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, New York, *for Plaintiff-Appellant*.

TIMOTHY P. MURPHY (Herbert L. Greenman, *on the brief*), Lipsitz Green Scime Cambria, Buffalo, New York, *for Defendant-Appellee*.

EATON, *Judge*:

Plaintiff-appellant, the United States, appeals from an August 19, 2010 suppression order entered in the United States District Court for the Western District of New York (William M. Skretny, *Judge*). On July 10, 2008, a federal grand jury returned a two-count indictment charging defendant-appellee Jimmy Lee Barner with being a previously-convicted felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (2006), and seeking forfeiture of the unlawfully possessed property under 18 U.S.C. §§ 924(d), 3665 and 28 U.S.C. § 2461(c) (2006). On August 19, 2010, the court granted Barner's motion to suppress physical evidence obtained during a search. Thereafter, the government filed an interlocutory appeal seeking review of the suppression order pursuant to 18 U.S.C. § 3731. Because we find that the search was proper under the "special needs" exception to the Fourth Amendment's warrant requirement, we reverse and remand for further proceedings consistent with this opinion.

## I. Background

On April 4, 2007, Barner, who was incarcerated in a New York State Correctional Facility following a felony conviction for robbery, executed a "Certificate of Release to Parole Supervision" in preparation for his discharge from prison to New York State parole supervision.

Barner's release was therefore subject to the conditions of his parole. One condition was that his "person, residence and property [were] subject to search and inspection," and thus he agreed to "permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment and . . . permit the search and inspection of [his] person, residence and property." J.A. 279. As a further condition, Barner was subject to a curfew that required him to be at his approved residence between 9:00 p.m. and 7:00 a.m. In addition, he was not permitted to "own, possess, or purchase any shotgun, rifle or firearm of any type," "to own, purchase, possess or use any type of ballistic vests, body armor, bulletproof vests or ballistic bunker or shield," or to "purchase, possess or have control over any ammunition." J.A. 279, 281. During the period of parole, Barner's parole officer, LaSonya Spearman, conducted two visits to Barner's apartment, which was located on the second floor of a house he shared with his mother, who resided on the first floor in the building's only other apartment.

On January 29, 2008, Parole Officer Spearman "received a phone call from a complainant that Mr. Barner had fired a weapon at him." J.A. 175. In response to this information, at 8:45 p.m. of the same day, Spearman and several other parole officers attempted to visit Barner at his home, but found no one present. The officers remained at the house for about twenty-five minutes, and Spearman sought to call both Barner's cellphone and that of his mother, to no avail. Based on the apparent violation of Barner's parole conditions, Spearman applied for and obtained a parole violation arrest warrant.

On the morning of January 31, 2008, Barner reported for his weekly parole office appointment, where he was handcuffed and taken into custody. Officer Spearman then informed him of the allegations she had received regarding the firearm violation of his parole conditions.

3

Barner denied having any firearms and responded "no" when the parole officers asked if "he had a problem" with them conducting a search of his residence. Although no search had yet been undertaken, Barner also signed a "Property Receipt" form, which is used by parole officers to inventory property obtained during a search, and which Spearman testified was used in this case to document Barner's consent to the search. At Spearman's request, Barner gave her a key ring with three keys, including one to the outside door of the apartment house, a key to his apartment within, and, what turned out to be, a key to a storage area adjacent to his apartment. Barner was taken to his residence by the officers for the search.

During the search, Barner was seated in his apartment's kitchen. While in the apartment, the officers seized various items, including a quarter bottle of brandy, a switchblade knife without a blade, and a baggie containing crack cocaine. While searching the apartment, an officer noticed a storage room door across the hallway, approximately ten feet away from the entrance to Barner's apartment, and asked another officer to hand him the key ring. Using one of the keys on the ring, the officer entered the storage room where he found four firearms, a bulletproof vest, two loaded magazines of ammunition, a scale, and some marijuana. The firearms and ammunition served as the basis for the felon-in-possession charge in the indictment.

Following his indictment, Barner filed a motion to suppress the items seized from the storage room, arguing that his parole conditions did not include a consent-to-search condition, and even if they did, the search of the storage area exceeded the scope of any such consent. The pretrial proceedings were referred to a magistrate judge, who held an evidentiary hearing. After the hearing, Barner further argued that, because he had been placed under arrest prior to the search, he was no longer "released" to parole when the search took place, and, as a result, the

4

release conditions were no longer in effect. The magistrate judge agreed, and issued a Report, Recommendation, and Order on May 5, 2010 recommending that the suppression motion be granted because "at the time of the search[,] defendant's release to parole supervision had been revoked." Report, Recommendation, and Order at 6, *United States v. Barner*, No. 08 CR. 170 (W.D.N.Y. May 5, 2010) ("RRO"). As to the oral and written consent purportedly given by Barner on the day of the search, the magistrate judge concluded that the scope of any such consent extended only to Barner's apartment proper, and not to the adjacent storage room.

Over the government's objections, the district court entered a text order adopting the RRO, thereby granting Barner's motion to suppress. On September 14, 2010, the government timely filed this interlocutory appeal seeking review of the suppression order, contending that the evidence ordered suppressed was "substantial proof" of a material fact in the proceeding, 18 U.S.C. § 3731, which, if suppressed, would end the government's case against Barner.

## II. Standard of Review

"When evaluating a district court's grant of a motion to suppress evidence, we review that court's findings of fact for clear error, considering them in the light most favorable to the government, and we review questions of law *de novo*." *United States v. Julius*, 610 F.3d 60, 64 (2d Cir. 2010) (citing *United States v. Howard*, 489 F.3d 484, 490–91 (2d Cir. 2007)); *see also United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004) ("We review *de novo* the legal issues presented by a motion to suppress.").

## III. Discussion

### A. The Fourth Amendment Prohibition of Unreasonable Searches and Seizures

"The Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *Newton*, 369 F.3d at 664 (citing U.S. Const. amend. IV; *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001)). To this end, the Fourth Amendment restrains the government from engaging in "unreasonable searches and seizures," U.S. Const. amend. IV, hence, the "touchstone in evaluating the permissibility of any search is 'reasonableness.'" *Julius*, 610 F.3d at 64 (quoting *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004); *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). Reasonableness "is determined 'by assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Reasonableness generally "'requires a warrant and probable cause[,]'" *Julius*, 610 F.3d at 64 (quoting *Lifshitz*, 369 F.3d at 178), but "the law recognizes certain exceptions to this rule." *Newton*, 369 F.3d at 665.

### B. The District Court's Findings

The district court focused primarily on an analysis of "each form of consent argued by the government," RRO at 6, finding that none of them rendered the warrantless search

6

constitutional. RRO at 6–10.[1]  In particular, as to the government's claim that, by agreeing to the parole conditions, Barner consented to the search of the storage room, the district court found that the consent-to-search provision was not "operative at the time of the search" because the court determined that after Barner's arrest, his "release to parole supervision had been revoked." RRO at 6–7.  The court supported this conclusion by pointing to other parole conditions that could only be in effect if Barner were not in physical custody (e.g., that Barner would "proceed directly to the area to which [he had] been released," would "not leave the State of New York . . . without permission," and that he would "permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment"), and observed that "the fact that the parole officers felt it necessary to obtain another consent from defendant [by having him execute the Property Receipt] strongly suggests that even they did not believe that the 'Conditions of Release' were applicable at the time."  RRO at 7.

---

[1]  It is worth noting that the government's unresponsiveness during and following the suppression hearing may have contributed to the decision of the district court to grant the motion to suppress.  Indeed, as noted in the RRO, the magistrate judge

> directed the parties . . . to address in their post-hearing briefs the question of "whether a reference to a residence includes adjacent storage areas" and repeated this directive in a Text Order.  The failure of the government (which bears the burden of proof on the issue of scope of consent) to submit any authority or argument on this issue is a further reason for granting the motion to suppress.

RRO at 8 n.5 (citations to record omitted).  The RRO also notes that

> [a]t the close of the hearing, [the magistrate judge] asked the parties in their post-hearing briefing to address "the effect, if any, of even a temporary revocation of release . . . on the conditions of release including consent to search" [and] repeated that directive in a Text Order.  The government, which bears the burden of proof on the issue of consent, has failed to directly respond to that inquiry.

RRO at 7 (citations to record omitted).

## C.  The "Special Needs" Doctrine

In the context of parole and probation, the

> Supreme Court has explained that "[a] State's operation of a probation system[2] . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."  As a result, probationers may be subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large."

*United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) (citation omitted) (alterations in

original) (quoting *Griffin*, 483 U.S. at 873–75).  Indeed, the Supreme Court has found that

"parolees . . . have severely diminished expectations of privacy by virtue of their status alone."

*Samson v. California*, 547 U.S. 843, 852 (2006); *see also United States v. Massey*, 461 F.3d 177,

178–179 (2d Cir. 2006) ("A parolee's reasonable expectations of privacy are less than those of

ordinary citizens . . . ." (citing *Knights*, 534 U.S. at 119–20)).  As a result, "[o]n several

occasions, the Supreme Court has indicated that searches of probationers may be pursued

without a warrant and under a standard lower than that of probable cause."  *Lifshitz*, 369 F.3d at

179; *see also Grimes*, 225 F.3d at 258 ("'Parole is meted out in addition to, not in lieu of,

---

[2]    As this Court stated in *Newton*,

> [p]robation, parole, and supervised release systems are charged with similar duties: "'(1) to assist the offender in the rehabilitation process; (2) to protect the public from persons whose release proves threatening to the community; and (3) to provide information and recommendations to the court or parole board so that it may make appropriate decisions regarding continued freedom for the individual released.'"  Accordingly, it is appropriate to draw from the law on probation and supervised release in considering whether the warrantless parole search of [a parolee's] residence was reasonable under the special needs exception to the warrant requirement.

*Newton*, 369 F.3d at 665 n.2 (citation omitted) (quoting *United States v. Reyes*, 283 F.3d 446, 455 (2d Cir. 2002); 1 Neil P. Cohen, *The Law of Probation and Parole* § 17:1, at 17-2 (2d ed. 1999)).

incarceration[,] . . . ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.'" (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990))).

Furthermore, the "allegation [of a parole violation] and the resulting issuance of a warrant for retaking . . . operate to remove a parolee one step farther from the constitutional protection enjoyed by ordinary citizens." *United States v. Polito*, 583 F.2d 48, 55 (2d Cir. 1978).

Nonetheless, "the law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.'" *Newton*, 369 F.3d at 665 (quoting *Griffin*, 483 U.S. at 873). Under New York State law, as announced by the New York Court of Appeals in *People v. Huntley*, the determination as to whether a warrantless parole search "was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *People v. Huntley*, 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 34, 371 N.E.2d 794, 797 (1977). In *Grimes*, moreover, this Court held that

> the New York rule [articulated in *Huntley*] is coextensive with the requirements
> of the Fourth Amendment. A rule indicating that a search of a parolee is
> permissible so long as it is reasonably related to the parole officer's duties is
> identical to a rule that parole officers may conduct searches so long as they
> comport with the Fourth Amendment. This is because the doctrine of "special
> needs" permits those searches that are reasonably related to the special needs
> animated by management of a parole system.

*Grimes*, 225 F.3d at 259 n.4 (internal citation omitted) (citing *Chandler v. Miller*, 520 U.S. 305, 313–14 (1997)); *see also Newton*, 369 F.3d at 666. Additionally, as we stated in *Newton*, "neither *Huntley* nor *Grimes* holds that consent, whether obtained pursuant to parole regulation . . . or otherwise, is required in addition to a reasonable relationship to the parole officer's duty to justify a warrantless parole search." *Newton*, 369 F.3d at 666; *see also id.* at 668 ("[T]he rule we

9

approved in *United States v. Grimes* does not require a parolee's consent to permit parole officers to conduct a warrantless search reasonably related to their supervision responsibilities.").[3]

With these cases in mind, the central issue here is "whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34, 371 N.E.2d at 797; *see Grimes*, 225 F.3d at 259 n.4. As this Court has held, parole officers have a duty "to investigate whether a parolee is violating the conditions of his parole, . . . one of which, of course, is that the parolee commit no further crimes." *United States v. Reyes*, 283 F.3d 446, 459 (2d Cir. 2002). Here, Parole Officer Spearman had received information that Barner (1) possessed a gun, and (2) had fired it at the complainant. These allegations, if true, would have constituted criminal parole violations separate from and far more serious than the curfew breach. Once Spearman had this information, it was clearly reasonable for her to investigate the accusations further. Thus, the ensuing search satisfied the reasonable relationship requirement of *Huntley* because it was performed in direct response to information that Spearman obtained and that she had a duty to investigate further, both to determine if a crime had been committed, and to prevent the commission of further crimes. *See Newton*, 369 F.3d at 666 (holding that a search for firearms in a parolee's residence satisfied *Huntley* because "the obligation to detect and prevent parole

---

[3] In *Newton*, we noted that the reasonableness of the search there at issue was reinforced by a consent rule established by the New York State Division of Parole's Policy and Procedures Manual, which was satisfied by Newton's signed Certificate of Release. *See Newton*, 369 F.3d at 666. Because that state rule "exceeds" the reasonable relationship requirement held constitutionally satisfactory in *Grimes*, *id.*, and is not invoked by Barner here, we do not consider how it applies in this case to a parolee placed under arrest.

10

violations so as to protect the public from the commission of further crimes is part of a parole officer's duty" (internal quotation marks omitted)).  Therefore, Parole Officer Spearman's "particular conduct . . . [was] substantially related to the performance of duty in the particular circumstances."  *Huntley*, 43 N.Y.2d at 181, 401 N.Y.S.2d at 34, 371 N.E.2d at 797.

Furthermore, Barner was not restored to full Fourth Amendment protection upon his arrest.  If anything, the allegation of a parole violation and issuance of the arrest warrant removed Barner "one step farther from the constitutional protection enjoyed by ordinary citizens."  *Polito*, 583 F.2d at 55.  Moreover, we conclude that the parole officers having placed Barner under arrest for a parole violation, earlier that same day, did not render the search unreasonable.  *Huntley* did not purport to confine its rule to whether the defendant was on "release," but rather on whether the search was rationally and reasonably related to the parole officer's duties.  *Cf. Huntley*, 43 N.Y.2d at 182–83, 401 N.Y.S.2d at 35, 371 N.E.2d at 798 (observing that the "standard authorization" consenting to searches of person, residence or property "merely parallels, by way of confirmation, the right of the parole officer . . . to conduct searches rationally and substantially related to the performance of his duty").[4]  Indeed, in both *Huntley* and *Grimes*, as here, the defendants were taken into custody, pursuant to outstanding parole violation warrants, immediately prior to the challenged search.  *See id.*, 43 N.Y.2d at 180,

---

[4]    Because we conclude that *Huntley* controls this case, we need not and do not reach Barner's argument that his arrest terminated his "release" and revoked the condition that permitted searches of his person, residence, and property.  That question is necessarily informed by New York law, which appears to distinguish between liberty from detention and release on parole, providing for the latter to be revoked only after a formal revocation hearing.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9, § 8005.20 (noting that upon sustaining a violation at the revocation hearing, "the presiding officer shall revoke the violator's release.").

11

401 N.Y.S.2d at 33, 371 N.E.2d at 796; *Grimes*, 225 F.3d at 256. A parole officer's duty to investigate violations of parole does not vanish the moment a defendant is taken into custody for a violation. Nor does it alter our analysis that Barner was taken into custody at the parole office and then escorted to his residence, whereas in *Huntley* and *Grimes* the parole officers took the defendant into custody at the residence itself.[5]

It is worth noting, however, that we do not here decide whether a search conducted days or weeks after a parolee's arrest and detention may become so attenuated from the parole officers' duties so as not to satisfy the *Huntley* rule. We conclude only that this is not that case. Therefore, we find that, notwithstanding the district court's findings regarding consent, under the "special needs" exception, the storage room search was proper because it was rationally and reasonably related to the parole officers' duties, and was performed in furtherance of the special needs of the New York State parole system.

### D. Remaining Issues

Having found that the search of the storage room was proper under the "special needs" exception to the Fourth Amendment warrant requirement, we do not address whether Barner consented to the search. Nor need we decide in this case whether the search could have been

---

[5] It is further immaterial to our analysis that the parole officers searched a storage room near Barner's apartment, whereas in *Huntley* and *Grimes*, the officers searched the defendant's residence. Given the information that Barner possessed a gun, it was reasonably related to the parole officers' duties to search this storage room containing Barner's property. That New York law required Barner to consent to the search of his "person, residence, and property" as a condition of release further reinforces this conclusion. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2(d).

justified under *Samson*, 547 U.S. 843 (holding lawful a suspicionless search based upon a release condition), without resort to our past "special needs" jurisprudence applying the *Huntley* standard. *See, e.g.*, *United States v. Watts*, 301 F. App'x 39, 42 n.2 (2d Cir. 2008) ("[H]aving determined that the search in this case satisfied the requirements of *Huntley*[,] . . . the search would have also satisfied the lower bar imposed in *Samson* . . . . We therefore save any further analysis for a case where a distinction between *Huntley* and *Samson* would make a difference.").

Finally, we have considered Barner's remaining arguments and find them to be without merit.

IV.  Conclusion

For the foregoing reasons, the order of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.