**UNITED STATES of America, Appellee,**

**v.**

**Donald REYES, Defendant–Appellant,**

**Robert Jubic, Defendant.**

**Docket Nos. 01–1099, 01–1110.**

United States Court of Appeals, Second Circuit.

Submitted Sept. 21, 2001.

Decided March 7, 2002.

**450**

Kevin A. Luibrand (Adrienne Kerwin, on the brief), Tobin & Dempf, Albany, NY, for Defendant–Appellant, on submission.

William C. Pericak, Assistant United States Attorney (Daniel J. French, United States Attorney, on the brief), United States Attorney's Office for the Northern District of New York, Albany, NY, for Appellee, on submission.

Before: FEINBERG, JACOBS, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Defendant Donald Reyes timely appeals from the denial of his motion to suppress by the United States District Court for the Northern District of New York (Thomas J. McAvoy, *then-Chief Judge* ). Following the denial of his motion to suppress, Reyes pleaded guilty to, and was convicted on, one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1), and admitted guilt and was convicted for violation of the conditions of his supervised release (weapon possession, new drug offense, and drug possession). Reyes now offers three reasons why the District Court should have suppressed evidence of marijuana plants growing in his yard and in his home. First, Reyes claims that even though he is a convicted person serving a court-imposed sentence of federal supervised release, his Fourth Amendment rights are entitled to full legal protection, making the warrantless search of his property by United States probation officers ("probation officers" or "USPOs") unconstitutional. Second, he argues that probation officers discovered marijuana plants in his yard by unlawfully standing in a constitutionally protected curtilage area. Third, Reyes contends that the probation officers' conduct in this case is prohibited by the so-called "stalking horse" theory, pursuant to which a probation officer may not use his authority to conduct a home visit to help law enforcement officers evade the Fourth Amendment's usual warrant and probable cause requirements for police searches and seizures.

The District Court rejected these arguments, finding that it was lawful for probation officers conducting a home visit of a convicted person serving a term of federal supervised release to walk on the driveway toward the backyard to determine whether anyone was at home. The District Court held that, in such circumstances, the "plain view" exception to the Fourth Amendment warrant requirement applied, and it declined to suppress evidence of the probation officers' discovery of marijuana plants in defendant's yard. The District Court also concluded that the "stalking horse" defense did not apply, because the probation officers had a clear duty to make home visits and were lawfully on Reyes's premises for that purpose.

**I.**

In considering a district court's denial of a motion to suppress, we review the court's factual findings under a "clearly erroneous" standard, construing all evidence in the light most favorable to the government. *See, e.g., United States v.*

*Glover,* 957 F.2d 1004, 1007 (2d Cir.1992). Accordingly, we take the facts set forth below primarily from the record of the District Court's October 2, 2000 suppression hearing, drawing all inferences in the government's favor and according deference to the District Court's findings.

In mid–1999, Reyes began a three-year term of federal supervised release following his incarceration upon conviction before then-Chief Judge McAvoy for conspiracy to possess with intent to distribute marijuana. Standard Condition # 10 of the terms of Reyes's supervised release imposed by the District Court, which is recommended under United States Sentencing Guidelines § 5D1.3(c)(10), provides, "You shall permit a probation officer to visit *at any time at home or elsewhere* and shall permit confiscation of any contraband observed in plain view by the probation officer." Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 5/12/98, at 2 (emphasis added); *see also* U.S. Sentencing Guidelines Manual § 5D1.3(c)(10) (2000, 2001).[1] Pursuant to this standard condition of supervised release, United States Probation Officer ("USPO") Merry Jill Blomquist, accompanied by another probation officer, attempted to conduct an unannounced home visit to Reyes on December 6, 1999 and again on May 31, 2000. Blomquist concluded that Reyes was not at home on both of these occasions. Nevertheless, because he was maintaining a job, appearing for appointments at the United States Probation Office ("Probation Office" or "Probation"), and testing negative for drug-use, Reyes seemed to be doing well on supervised release.

Shortly before July 10, 2000, Special Agent Donald Abrams of the Drug Enforcement Agency ("DEA") contacted USPO Blomquist and, later, Deputy Chief USPO John Watts to inform them that DEA information suggested that Reyes, a resident of Woodward Avenue in Troy, New York, might be involved again in the growth and distribution of marijuana. Abrams also told Blomquist and Watts that the DEA expected to execute a search warrant at the home of Reyes's next-door neighbor, Steven Posniewski, who (in the DEA's view) definitely was engaged in such activity. Abrams did not apply for a search warrant for Reyes's house, because Abrams did not believe that he had enough information to obtain one.

During their telephone conversation, Abrams asked Watts to coordinate a home visit to Reyes with the DEA's search of Posniewski's residence. Watts understood from Abrams that the DEA was interested in whether Reyes was engaged in a marijuana growing operation; if Reyes was involved, the DEA expected that a large number of marijuana plants and cultivation apparatuses would be present in Reyes's house and "readily apparent in a home visit." (Suppression Hr'g Tr. of 10/2/00, at 18.)

After explaining to Abrams the "parameters" of home visits and that the probation officers would "do the home visit within [their] own format," Watts concluded that it would be "efficient" to coordinate with the DEA to ensure that, if Reyes was

---

1. Both the 2000 and 2001 editions of the U.S. Sentencing Guidelines Manual § 5D1.3(c)(10) provide:

 (c) (Policy Statement) The following "standard" conditions are recommended for supervised release[:] . . .

 (10) the defendant shall permit a probation officer to visit the defendant *at any time at home or elsewhere* and shall permit confiscation of any contraband observed in plain view by the probation officer.

(emphasis added).

indeed growing marijuana—a violation of his conditions of supervised release—the Probation Office would discover it before the search next door spurred Reyes to destroy the evidence. (*Id.*) Watts discussed with Abrams "what [Probation] could do, what they couldn't do, [and] what they could and could not do in conjunction with [the DEA search] operation." (*Id.* at 100.) Watts and Abrams agreed that if a probation officer observed drugs in plain view, the officer would notify the DEA upon exiting Reyes's home, "which is part of [the Probation Office's] policy," but that the DEA "were not, under any circumstances, going to come in the house" with the probation officers to conduct the home visit. (*Id.* at 50.) Watts testified that this course of action was elected pursuant to the Probation Office's "search policy for the Northern District of New York that states that [probation officers] generally are not to seize marijuana or drugs when [they] see them in plain view, but an officer is to tell [his] supervisor and to contact the local authorities so that it can be handled through the legal process." (*Id.* at 36; *accord* Mem. from Paul W. DeFelice, Chief USPO for N.D.N.Y., approved by then-Chief Judge Thomas J. McAvoy, to All USPOs for N.D.N.Y. of 11/18/94, at 2 (regarding district policy on search and seizure.))

On July 10, 2000, USPOs Watts, Blomquist, and Christopher McNeill met members of the DEA and the Troy Police Department at 5:00 AM at the Troy Police Department's Special Operations Office, from which they all traveled to Woodward Avenue. Troy police and DEA agents were assigned to assist in the DEA search of Posniewski's house. New York law enforcement and parole personnel provided security for Probation's home visit to Reyes (next door), since Probation was uncertain as to what it might encounter in light of the DEA's suspicions that Reyes was growing marijuana. Special Agent

Abrams testified that no DEA agents were assigned to back up Probation's home visit to Reyes. New York State ("NYS") Parole Officer Michael P. Smith, who regularly worked with the Special Operations Section of the Troy Police Department and the Drug Task Force (consisting of federal, state, and local law enforcement agents), was asked to assist in the home visit by subduing, if necessary, the dog at Reyes's residence and by generally providing additional security.

The DEA resolved to execute its search warrant for Posniewski's house at just after 6:00 AM. Sometime thereafter, upon cue from the team searching Posniewski's house, the probation officers attempted the home visit to Reyes. Although the probation officers repeatedly knocked on the front door and called out that they had come to do a home visit, no one answered the door at Reyes's house. The probation officers also called Reyes by cellular telephone and left a message on his home answering machine, but no one answered the call or responded to the message. Nevertheless, Reyes's black truck and his girlfriend's gray sports car were both in the driveway with keys in the ignitions, and, in Blomquist's view, the dog inside the Reyes house "did not display the same amount of aggression that he did at the first two [attempted] home visits," suggesting to Blomquist that "someone was probably home." (Mem. of USPO Merry Jill Blomquist to Deputy Chief USPO John Watts of 9/29/00, at 2.)

After waiting "a substantial period of time" (Suppression Hr'g Tr. of 10/2/00, at 144)—a minimum of ten to fifteen minutes—for Reyes to answer the door, Watts walked over to the left side of the property and then walked along what appeared to be a gravel driveway to determine, among other things, whether Reyes was in the backyard or whether someone was looking

out the window. Watts observed a chain hanging from two posts across a portion of the driveway; it did not extend the full width of the driveway. After listening to testimony from Watts and NYS Parole Officer Smith, the District Court found that the chain and posts "did not block off ingress and egress for pedestrians but appeared to be something that would be put in place to keep vehicles either in or out of that area." (*Id.*) Seeking to escape insects at the front of the house and to change his vantage point of the house, NYS Parole Officer Smith also walked to the left side of the house and along the driveway toward the backyard. From the driveway, he observed what appeared to be potted marijuana plants in the yard and pointed them out to USPO Watts. Watts then called a few other officers over to take a look at the plants, including two other NYS parole officers and one officer of the Troy Police Department.

Watts and the others "regrouped in the front of the house," (*id.* at 33), and Watts consulted with DEA Special Agent Abrams, who had been informed by several others, while he was next door conducting the search of Posniewski's residence, that marijuana plants had been located in Reyes's yard. Watts considered whether he had observed enough to find that Reyes had violated the conditions of his supervised release, while Abrams evaluated whether the DEA had enough information to obtain a search warrant for Reyes's house. Watts testified unequivocally at the suppression hearing that he did not ask Abrams what to do next; rather, the two discussed the situation, since it was "unclear" for both of them, and offered their respective thoughts about what might occur. (*Id.* at 55.)

At this point, Reyes came out of the house "with his hands up in the air, certainly, not as if somebody was pointing a weapon at him, ... and said what's going on[.]" (*Id.* at 103.) USPO Blomquist approached him and explained that Probation was there to conduct a home visit. In response, Reyes agreed to allow only the federal probation officers—Blomquist, Watts, and McNeill—to enter the house. When Blomquist entered the residence and asked Reyes whether he had any weapons, Reyes retrieved a machete from beneath his bed in his bedroom and surrendered it to the probation officers. He then showed the probation officers around the rest of the house, excluding the bathroom where the dog was detained and the marijuana "grow room" that was discovered later. Upon inquiry by USPO Watts, Reyes denied any knowledge of the marijuana plants in the yard. Watts then informed Reyes "that there [were] DEA agents outside and that they may have some questions for him on that," but "that was between him and them," since Probation was finished with its home visit. (*Id.* at 36.) The probation officers then exited Reyes's home.

After the probation officers went back outside, Watts told Abrams that the probation officers saw nothing in plain view in the home indicating that marijuana was being grown in the house; that Reyes denied knowledge of the plants in his yard; and that they had recovered a machete. At that point, Abrams approached Reyes, "who was in between ... going in the house and in the front door," and asked to speak with him about the situation. (*Id.* at 104.) Reyes agreed and proceeded into the house with Abrams and the three federal probation officers in tow. The probation officers remained nearby, but did not participate in the conversation that ensued between Reyes and Abrams. Abrams explained to Reyes that, based on the marijuana plants located outside, the DEA would pursue a search warrant if necessary, but that Reyes could also "sign a consent search, which he absolutely did not

have to do," permitting the DEA to proceed to search immediately. (*Id.* at 105.) Reyes then admitted to Abrams that the marijuana plants in the yard were his and, after Abrams explained the consent-to-search form, Reyes signed the document.

The three probation officers deliberately left Reyes's house at this point and waited outside, so as not to be involved in the DEA search. Abrams then directed investigators under his command to search the home. In response to questions from Abrams during the search, Reyes showed Abrams the location of forty-six marijuana plants on the property outdoors; he also showed Abrams the marijuana "grow room" in the house, which he had not shown to the probation officers earlier and which did not, at this time, contain any plants. In the course of the consensual search, thirty-eight plants (all uprooted, it appears, from the "grow room") were found hidden behind a heating unit in the garage. Reyes also admitted to Abrams that while the probation officers were outside calling out for Reyes to answer the door, he had disposed of still more indoor plants that he had cultivated in the "grow room."

Slightly over a week after this search, on July 18, 2000, Probation filed in the District Court a Petition for Warrant or Summons for Offender Under Supervision, charging Reyes with three violations of the conditions of his supervised release: possession of a weapon (a machete and a bayonet); possession of marijuana (forty-six plants outside of his home and thirty-eight uprooted plants inside the garage); and possession of narcotics-related paraphernalia (apparatuses for growing marijuana, including lights, reflective panels, and fertilizer).

On August 2, 2000, Reyes was indicted on one count of manufacturing marijuana and one count of possession of marijuana with intent to distribute.

Reyes thereafter moved to suppress the evidence supporting both the Petition and the Indictment, claiming that the probation officers had conducted a warrantless and unlawful search of his property; had discovered the marijuana plants in his yard by unlawfully standing in a constitutionally protected curtilage area; and had acted unlawfully as a "stalking horse" for the DEA.

After holding a suppression hearing on October 2, 2000, in which three key witnesses—Watts, Smith, and Abrams—were thoroughly examined over the course of nearly four hours, the District Court rejected all of Reyes's claims. It found that the probation officers lawfully entered onto Reyes's property—that "when somebody is subject to home visits, somebody goes to the house to find out if somebody's home, [and] certainly would at least walk around to the side or the back of the house in an attempt to find if somebody was there, [and] maybe knock on the back door." (*Id.* at 145.) Moreover, the District Court found that the probation officers stood on what was "clearly a driveway with access for pedestrian traffic" and that "keeping in mind the . . . prior decision in [*Krause v. Penny*, 837 F.2d 595 (2d Cir. 1988),] . . . a driveway area is not an area in which one would normally have [an] expectation of privacy." (*Id.* at 145, 146.) Accordingly, the court found that "the plain view exception[ ] applies in this case." (*Id.* at 146.) It also held that "[t]he stalking horse defense . . . doesn't apply in this case where the [probation officers] going in had a clear duty to make home visits and [were] lawfully there for that purpose." (*Id.* at 146.)

On appeal, Reyes presses the same claims asserted unsuccessfully before the District Court in support of his motion to suppress. In response, the government argues that as a person on federal super-

vised release, Reyes had a diminished expectation of privacy, making it reasonable and lawful for probation officers to walk on his driveway during a court-imposed home visit, and that it was during this lawful entry on Reyes's property that they observed in plain view potted marijuana plants in Reyes's yard. The government also contends that the District Court correctly rejected application of the "stalking horse" theory. Finally, the government asserts that the exclusionary rule is not applicable to federal supervised release revocation hearings.

## II.

### A. The Role of the United States Probation Officer

Since federal probation was established in 1925, federal probation officers have been charged with two basic duties: to conduct pre-sentence investigations and to supervise federal offenders. John P. Storm, *What United States Probation Officers Do,* 61 FED. PROBATION 13, 13 (March 1997); *see generally* Sharon M. Bunzel, *The Probation Officer and The Federal Sentencing Guidelines: Strange Philosophical Bedfellows,* 104 YALE L.J. 933 (1995) (discussing the evolving role of the federal probation officer in sentencing determinations). In fulfilling these obligations, the federal probation officer works at the cross-section of social work, law enforcement, and penology. The probation officer assumes "a threefold responsibility: (1) to assist the offender in the rehabilitation process; (2) to protect the public from persons whose release proves threatening to the community; and (3) to provide information and recommendations to the court or parole board so that it may make appropriate decisions regarding continued freedom for the individual released." 1 NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE § 17:1, at 17–2 (2d

ed.1999) (discussing probation and parole officers in state and federal systems).

In the instant case, we focus on the supervisory role of federal probation officers. We consider the functions of United States probation officers monitoring convicted persons serving a court-imposed term of federal supervised release and, in particular, the scope of their authority in conducting home visits to these offenders. "In its simplest terms, supervision may be defined as the oversight that an officer exercises over those committed to his or her custody." PAUL F. CROMWELL, JR. ET AL., PROBATION AND PAROLE IN THE CRIMINAL JUSTICE SYSTEM 219 (2d ed.1985) (discussing probation and parole officers). However, the responsibilities of federal probation officers are indeed greater and more complex than this description suggests.

■ It is well understood that "United States probation officers serve as officers of the court...." Supervision of Federal Offenders, Monograph 109, Probation and Pretrial Services Division, Administrative Office of the United States Courts, August 11, 1993 ("Supervision of Federal Offenders"), at 1. In fact, since "[t]he United States Probation Office is established pursuant to the direction of Congress as an arm of the United States District Court[,] ... it is reasonable to view the United States Probation Office itself as a legally constituted arm of the judicial branch." *United States v. Inserra,* 34 F.3d 83, 88 (2d Cir.1994); *see also* 18 U.S.C. § 3602(a) ("A district court of the United States shall appoint qualified persons to serve ... as probation officers within the jurisdiction and under the direction of the court making the appointment."). In his capacity of confidential adviser to the court, the federal probation officer has been regarded as "the court's 'eyes and ears,' a neutral information gatherer with loyalties to no one but the court." Bunzel, *ante,* at 945.

■ Federal probation officers "are responsible for the supervision of all persons conditionally released to the community by the courts, the Parole Commission,[2] Federal Bureau of Prisons, and military authorities. Their supervision mission is *to execute the sentence,* control risk, and promote law-abiding behavior." Supervision of Federal Offenders, at 1 (emphasis altered from original). Indeed, supervised release, the "form of post-imprisonment supervision" at issue in this case, is imposed by a federal district court "as *part of a total sentence in addition to* a period of incarceration at the time of the initial sentencing of a convicted federal criminal defendant." COHEN, *ante,* § 5:11, at 5–22 (emphasis added); *see also* 18 U.S.C. § 3583(a) ("The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include *as a*

*part of the sentence* a requirement that the defendant be placed on a term of supervised release after imprisonment ...." (emphasis added)). That is, the district court orders in the judgment of conviction itself that the offender is sentenced to a term of supervised release following incarceration. *See, e.g.,* Judgment in a Criminal Case for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 2/6/01, at 3–4. Thus, supervised release is an integral part of the original sentence imposed pursuant to court order and executed by the federal probation officer.

To fulfill his supervision mission, the federal probation officer must instruct the offender about the conditions of his release. Supervision of Federal Offenders, at 3; 18 U.S.C. § 3603(1); Storm, *ante,* at 16. Supervision planning then evolves throughout the term of supervision, begin-

---

**2.** Parole was abolished in the federal criminal justice system as of November 1, 1987. Sentencing Reform Act of 1984, Pub.L. No. 98–473, Tit. II, §§ 218(a)(5), 235(a)(1), 98 Stat 1837, 2027, 2031, as amended by Sentencing Amendments Reform Act of 1985, Pub.L. No. 99–217, § 4, 99 Stat 1728; *see also* 18 U.S.C. ch. 311, §§ 4201–4218. However, the United States Parole Commission will remain in existence until November 1, 2002, unless this expiration date is extended. Parole Commission Phaseout Act of 1996, Pub.L. No. 104–232, § 2(a), 110 Stat. 3055; *see also* COHEN, *ante,* § 1:12, at 1–21. "Since the repeal of the parole statutes, the [United States Parole Commission] supervises inmates convicted before repeal by enlisting [United States] probation officers to perform the functions of parole officers." *Wilson v. United States,* 959 F.2d 12, 15 (2d Cir.1992) (citations omitted). It is expected that "defendants sentenced ... for criminal conduct that occurred before [the] abolition [of parole] will be released from prison [on parole by the United States Parole Commission] under the supervision of [a United States] probation officer well into the [twenty-first] century. In contrast to persons on ... supervised release who are under the jurisdiction of the sentencing court, individuals released on parole ... remain in the legal custody of the Attorney General while

serving a portion of their sentence of imprisonment in the community." John P. Storm, *What United States Probation Officers Do,* 61 FED. PROBATION 13, 15 (March 1997); *see also* 18 U.S.C. § 3583 ("The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include as part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment ...."); *id.* § 3601 ("A person who has been ... placed on supervised release pursuant to the provisions of section 3583, shall, during the term imposed, be supervised by a probation officer to the degree warranted by the conditions specified by the sentencing court."). Accordingly, "some probation officers wear two hats, sometimes acting as parole officers, other times as probation officers, depending on who is being supervised." *Wilson,* 959 F.2d at 15. It is worth noting that "[a]lthough the powers of the two offices rest in one person, they nonetheless remain distinct. Two separate statutory regimes govern each set of functions.... Therefore, while the same person may be authorized to perform both functions, the officer is constrained by the statutes to differentiate between those powers, depending on the function being performed." *Id.* at 15–16 (citations omitted).

ning with a preliminary plan formulated in the initial sixty-day assessment period and continuing with formal re-evaluations of the offender's progress every six months. Supervision of Federal Offenders, at 13–24; Storm, *ante*, at 16. During the term of supervision, the probation officer is charged with identifying supervision issues and planning an intervention strategy to address those issues with the offender. These strategies run the gamut from arranging referrals for substance abuse treatment to field contacts. *See generally* Supervision of Federal Offenders, 13–37 (discussing the planning and implementation of the supervision process). Probation officers are to give "[h]ighest priority ... to those issues which, if not addressed, will most likely jeopardize the community." Storm, *ante*, at 16. A "probation officer, dissatisfied with the offender's progress, but not sufficiently so to initiate revocation proceedings, may seek to modify conditions to make them more specific or demanding." COHEN, *ante*, § 16:4, at 16–8.

As "represent[atives of] the public interest," probation and parole officers are "often the most appropriate" persons to bring to the attention of the court or the parole board an offender's conduct that is threatening to the public. *Id.* at 16–8 (discussing probation and parole officers in state and federal systems). To further the role of the probation officer as community protector, a probation officer is empowered to arrest a probationer or a convicted person serving a term of supervised release, with or without a warrant, "[i]f there is probable cause to believe that [the offender] has violated a condition of his probation or release." 18 U.S.C. § 3606.

■ In sum, probation officers, "charged with monitoring [an] offender's performance, owe[ ] a responsibility to the public to ensure that [the offender] who pose[s] a threat to public safety [is] not permitted to remain free, absent compli-

ance with conditions which obviate possible danger. To fulfill these functions, the ... probation officer needs considerable investigative leeway." COHEN, *ante*, § 17:7, at 17–11.

We now consider the scope of the "leeway" afforded to probation officers in the context of the case at hand.

## B. The Expectation of Privacy of a Convicted Person Serving a Term of Federal Supervised Release

On appeal from a district court's denial of a motion to suppress, we review *de novo* questions of law. *United States v. Glover*, 957 F.2d 1004, 1007 (2d Cir.1992).

■ It is well settled that "Fourth Amendment protections extend only to 'unreasonable government intrusions into ... legitimate expectations of privacy.'" *United States v. Thomas*, 729 F.2d 120, 122 (2d Cir.1984) (quoting *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). The focus of our inquiry, therefore, is whether Reyes, a convicted person serving a term of federal supervised release, had a legitimate expectation of privacy in his driveway and, if so, whether the actions of the probation officers were unreasonably intrusive. *See id.*

■ For an individual's expectation of privacy to be legitimate, he must have "exhibited an actual (subjective) expectation of privacy" and the expectation must be "one that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). It is beyond doubt that Reyes's actual expectation of privacy in the environs of his home was necessarily and significantly diminished because Reyes was a convicted person serving a court-imposed term of federal supervised release that mandated home visits "at any time" from his federal probation officer.

■ We have held that among "[t]he rights diminished by *parolee* status [are] Fourth Amendment protections." *Thomas*, 729 F.2d at 123 (emphasis added); *accord United States v. Grimes*, 225 F.3d 254, 258 (2d Cir.2000) ("*[P]arole* justifies some departure from traditional Fourth Amendment standards." (emphasis added)). This observation applies with equal force to individuals, like Reyes, subject to federal supervised release—the reformed successor to federal parole, *see ante* note 2. Like parole, supervised release is a term of supervision following incarceration. However, it differs from parole in an important respect: "unlike parole, supervised release does not replace a part of a term of incarceration, but instead is ... given *in addition to* any term of imprisonment imposed by a court." 1 NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE § 5:11, at 5–22 (2d ed.1999) (emphasis in original).[3]

Whether acting as a probation officer or a parole officer, *see ante* note 2, a United States probation officer is charged with enforcing conditions of supervision and with "discern[ing] deception and act[ing] accordingly." John P. Storm, *What United States Probation Officers Do*, 61 FED. PROBATION 13, 16, 17 (March 1997); *see also* 18 U.S.C. § 3603(4) ("A probation officer shall ... be responsible for the supervision of ... a person on supervised release who is known to be within the judicial district."); *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 368, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (observing that parole officers' "relationship with parolees is more supervisory than adversarial"); *Thomas*, 729 F.2d at 123 ("A parolee's diminished Fourth

Amendment protection regarding searches by a parole officer arises from the necessity for effective parole supervision and the unique relationship of the parole officer and the parolee."). In fact, enforcing the conditions of supervision

is the first priority in the hierarchy of a probation officer's supervision duties.... The performance of this duty requires the officer to verify compliance with the conditions of supervision through investigation of the status and conduct of the offender, timely confrontation of the offender when noncompliance is discovered, and enforcement of the conditions of the sentence.... Community supervision is not a passive program limited to the receipt of reports from the offender. The role of the officer is proactive.... Personal verification of the offender's reports of his or her status [is] essential throughout the supervision term.

Supervision of Federal Offenders, at 57–58. In the same way that "a parole officer, of necessity, must have investigative powers to gather information about the parolee's activities, environment, and social contacts" so as "[t]o ensure that the conditions of parole are not being violated and to monitor the parolee's progress of reintegration into society," *Thomas*, 729 F.2d at 123, "[f]ield contacts with [a convicted person serving a term of federal supervised release] are vital to ensure that the [probation] officer is aware of the offender's conduct and condition...." Storm, *ante*, at 17; *see also* 18 U.S.C. § 3603(2) ("A probation officer shall ... keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of ... a person on super-

---

**3.** We note that "special parole" terms, imposed as an additional penalty for drug offenses committed before October 27, 1986, like supervised release in our own time, follow a *fully completed* term of imprisonment.

However, special parole was replaced with supervised release in the Sentencing Reform Act of 1984 and its subsequent amendments. *United States v. Cuero Flores*, 276 F.3d 113, 116–17 (2d Cir.2002).

vised release, who is under his supervision, and report his conduct and condition to the sentencing court."); Supervision of Federal Offenders, at 35 ("If personal observation is necessary to verify compliance with conditions ..., the officer should make a field contact. Field supervision contacts ... are essential for the officer to fulfill his or her statutory requirement to maintain awareness of the offender's conduct and condition.").

One of the principal purposes of a probation/parole officer's observation and supervision responsibilities is to ensure that a convicted person under supervision does not again commit a crime. We have long recognized a duty on the part of the parole officer to investigate whether a parolee is violating the conditions of his parole, *see Scott,* 524 U.S. at 368, 118 S.Ct. 2014 (noting that parole officers' "primary concern is whether their parolees should remain free on parole"); *Thomas,* 729 F.2d at 123 ("A parolee is in the legal custody of a parole officer who monitors the parolee's adherence to the conditions of his or her parole.")—one of which, of course, is that the parolee commit no further crimes, 18 U.S.C. § 4209(a), *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, Tit. II, §§ 218(a)(5), 235(a)(1), 98 Stat 1837, 2027, 2031[4]; 28 C.F.R. § 2.40(a)(6)[5] —when the possibility of violation is brought to the officer's attention, *Thomas,* 729 F.2d at 124 (upholding parole officer's search of parolee's person and clothing upon discovering parolee had been convicted previously on drug charges and stating that it was parole officer's "duty ... to investigate further to determine whether [the parolee] was being rehabilitated or was violating the conditions of his parole"). Federal probation officers overseeing convicted persons serving terms of federal supervised release are similarly charged with monitoring supervisees' adherence to the conditions of their release, *see* 18 U.S.C. §§ 3603(2), (4)[6]; Storm, *ante,* at 17—which, as in the case of parole, includes the requirement that supervisees not commit further crimes, 18 U.S.C. § 3583(d)[7]; U.S.S.G.

4. Section 4209(a) provides in relevant part:
 In every case, the [Parole] Commission shall impose as conditions of parole that the parolee not commit another Federal, State, or local crime, [and] that the parolee not possess illegal controlled substances....
 18 U.S.C. § 4209(a), *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, Tit. II, §§ 218(a)(5), 235(a)(1), 98 Stat 1837, 2027, 2031.

5. Section 2.40(a)(6) provides:
 The following conditions are attached to every grant of parole and are deemed necessary to provide adequate supervision and to protect the public welfare. They are printed on the certificates issued to each parolee and mandatory releasee:
 ...
 (6) The parolee shall not violate any law, nor shall he associate with persons engaged in criminal activity. The parolee shall get in touch within two days with his probation officer or office if he is arrested or questioned by a law-enforcement officer.
 28 C.F.R. § 2.40(a)(6).

6. Section 3603 provides in relevant part:
 A probation officer shall—
 ...
 (2) keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of a probationer or a person on supervised release, who is under his supervision, and report his conduct and condition to the sentencing court; [and]
 ...
 (4) be responsible for the supervision of any probationer or a person on supervised release who is known to be within the judicial district.
 18 U.S.C. §§ 3603(2), (4).

7. Section 3583(d) provides in relevant part:
 The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance.
 18 U.S.C. § 3583(d).

§ 5D1.3(a)(1).[8] Accordingly, because probation officers monitoring convicted persons on supervised release bear the same supervisory responsibility as when acting as parole officers, we conclude that probation officers are required to investigate the "conduct and condition" of a supervisee, 18 U.S.C. § 3603(2), by, *inter alia,* undertaking "at any time" a home visit to determine whether the supervisee is violating the terms of his supervised release, including the condition that he not commit any further crimes. Here, the probation officers properly performed their duty to follow up on a tip from the DEA suggesting that Reyes had returned to a life of crime.

 The frequency, place, and nature of field contacts between a probation officer and a convicted person serving a term of federal supervised release is determined on the basis of the supervisee's profile, including risk assessments and the need to monitor the supervisee's compliance with the conditions of supervision. Storm, *ante,* at 17. Information received by the Probation Office from other sources, particularly law enforcement agencies, *see* Supervision of Federal Offenders, at 28, is also properly taken into account. Home visits, like the one conducted at Reyes's home on the morning of July 10, 2000, are routine and appropriate

elements of supervising a convicted person serving a term of supervised release.[9] Indeed, they are a long-standing practice of federal probation officers working under the authority of the District Court, 18 U.S.C. § 3583(d) ("The court may order, as a further condition of supervised release, ... any condition set forth as a discretionary condition of probation in section 3563 ... (b)(12) through (b)(20), and any other condition it considers to be appropriate."); 18 U.S.C. § 3563(b)(16) ("The court may provide ... that the defendant ... permit a probation officer to visit him at his home or elsewhere as specified by the court."), amply confirming and clearly signalling the offender's diminished expectation of privacy that is inherent in the very term *"supervised* release."

Reyes cannot, and does not, dispute that he *knew* he was subject to home visits by a probation officer at any time as a condition of his supervised release—which, in and of itself, indicates that he knew that his expectation of privacy was diminished by virtue of his status as a convicted person serving a term of federal supervised release. *See United States v. Knights,* 534 U.S. 112, ——, 122 S.Ct. 587, 589, 591, 151 L.Ed.2d 497 (2001); *Thomas,* 729 F.2d at 122–23; *see also* Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of

---

**8.** Section 5D1.3(a)(1) provides in relevant part:

> (a) <u>Mandatory Conditions</u>—(1) the defendant shall not unlawfully possess a controlled substance (<u>see</u> 18 U.S.C. § 3583(d)).

**9.** *See* U.S. Sentencing Guidelines Manual § 5D1.3(c)(10) (2000, 2001) ("(c) (Policy Statement) The following 'standard' conditions are recommended for supervised release[:] ... (10) the defendant shall permit a probation officer to visit the defendant *at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer."* (emphasis added)); Supervision of Federal Offenders, at

7–8 ("Standard conditions [of supervision] apply to all persons under active supervision and provide authority for monitoring and controlling the offender. They are: ... You shall permit a probation officer to contact you at *any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer."* (emphasis added)); Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 5/12/98, at 2 ("You shall permit a probation officer to visit at *any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer."* (emphasis added)).

N.N.Y., 5/12/98, at 2.[10] In *Knights*, the Supreme Court unanimously concluded that the probation search condition of the defendant's state probation—requiring him to submit to a search of his person, property, residence, vehicle, or personal effects "at any time," with or without a warrant or reasonable cause, "by any probation officer or *law enforcement officer*"—was a "salient circumstance" in the Fourth Amendment analysis of the search conducted in the defendant's apartment. 122 S.Ct. at 589, 591 (emphasis added). The Court noted, in particular, that the defendant had signed the probation order, which stated his awareness of the terms and conditions of his probation and his agreement to those terms. *Id.* at 589. Similarly, in *Thomas*, we acknowledged that conditions on a parolee's release, of which he is aware, diminish his expectation of privacy. 729 F.2d at 122–23 ("Having been alerted to the conditions of parole, [the defendant] would not have the expectation of privacy enjoyed by ordinary citizens.").

■ Accordingly, because Reyes was fully aware that the conditions of his supervision included home visits "at any time at home or elsewhere"—as demonstrated by his signature on the document specifically stating this condition of his supervised release—he had a severely diminished expectation of privacy with respect to any home visit by a probation officer.

The Supreme Court has acknowledged the need for exceptions to the warrant and probable cause requirements of the Fourth Amendment where an administrative agency has "special needs, beyond the normal need for law enforcement." *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (internal quo-

tation marks and citation omitted). The Court has held that "[a] state's operation of a probation system ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873–74, 107 S.Ct. 3164. The Court noted that the restrictions associated with probation are "meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875, 107 S.Ct. 3164. Accordingly, the Court concluded that "[t]hese same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Id.* at 875, 107 S.Ct. 3164. Supervision, we have been instructed, is "a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.*

■ These principles apply *a fortiori* to federal supervised release, which, in contrast to probation, is "meted out in addition to, not in lieu of, incarceration." *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir.1990) (observing that parole is "stronger medicine" than probation on the "continuum of possible punishments"). A convicted person serving a term of supervised release must comply with certain conditions, enforced by federal probation officers, or face further penal sanctions. *See, e.g.,* Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 5/12/98, at 1, 2 ("Revocation of ... supervised release is mandatory for possession of a controlled substance.") ("Upon a find-

---

10. Standard Condition # 10 of the terms of Reyes's supervised release imposed by the District Court provides: "You shall permit a probation officer to visit *at any time at home or elsewhere* and shall permit confiscation of any contraband observed in plain view by the probation officer." Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 5/12/98, at 2 (emphasis added).

ing of violation of . . . supervised release, . . . the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision."). The " 'overwhelming interest' in ensuring that a parolee complies with [parole] requirements and is returned to prison if he fails to do so," *Scott*, 524 U.S. at 369, 118 S.Ct. 2014, also exists in full measure with respect to a convicted person serving a term of federal supervised release. As a result, the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release. *See Griffin*, 483 U.S. at 878, 107 S.Ct. 3164 ("[E]ven more than the requirement of a warrant, a probable-cause requirement would reduce the deterrent effect of the supervisory arrangement.").

This conclusion is fortified by *Knights*, where the Supreme Court upheld a warrantless search of a state probationer's home by *a regular law enforcement officer* who was aware of the probationer's status (and was authorized to conduct a probation search, *see post* note 12 ) where the search was "supported by reasonable suspicion and authorized by a condition of probation." 122 S.Ct. at 593. "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." *Id.* at 592. Accordingly, consonant with the Supreme

Court's holding in *Knights* that "no more than reasonable suspicion" was required to search a state probationer's home when that search was authorized by a condition of probation, we hold that the probable cause requirements of the Fourth Amendment do not apply to a federal probation officer conducting a home visit—a far less invasive form of supervision than a search—pursuant to a convicted offender's conditions of supervised release. Furthermore, we hold that because home visits "at any time" are conducted pursuant to a *court-imposed condition* of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a *probation search*, probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*.

## C. The "Stalking Horse" Theory

 Reyes urges the Court to find that the probation officers' conduct in this case is prohibited by the so-called "stalking horse" [11] theory, pursuant to which a probation officer may not use his authority to conduct a home visit to help law enforcement officers evade the Fourth Amendment's usual warrant and probable cause requirements for police searches and seizures. In *United States v. Grimes*, 225 F.3d 254 (2d Cir.2000), we reserved decision on whether the so-called "stalking horse" theory exists under the law of this Circuit, finding no basis for it on the facts of that particular case, where "the conduct of the police was clearly proper." *Id.* at 259. However, a panel of the Ninth Cir-

---

**11.** In popular culture, the term "stalking horse" is used to refer to "a decoy." SAFIRE'S NEW POLITICAL DICTIONARY 750 (1993). "In hunting, a stalking horse is used to conceal a sportsman stalking game, allowing the hunter to get close to his quarry; from this expression, used in print since 1519, [stalking horse] has come to mean a person put forward to mislead." *Id.; see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2221 (1976) ("1: a horse or a figure like a horse behind which a hunter stalks game 2: something used to cover up a secret project: MASK, PRETENSE.").

cuit, in the context of a probation search—as opposed to a mere home visit—has articulated the contours of the "stalking horse" theory as follows:

A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

*United States v. Watts,* 67 F.3d 790, 794 (9th Cir.1995), *rev'd on other grounds,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (internal citations omitted); *accord* David N. Adair, Jr., *Probation Officer Searches,* 62 FED. PROBATION 68, 71 (June 1998); *see also United States v. McFarland,* 116 F.3d 316, 318 (8th Cir.1997) (stating that "a parole search is unlawful when it is nothing more than a ruse for a police investigation," but noting that "[p]arole and police officers may work together ... provided the parole officer is pursuing parole-related objectives").

The District Court held that the "stalking horse" theory was inapplicable here because the probation officers were lawfully on the scene pursuant to a clear duty of visitation. The District Court thus relied on its view as to the likely parameters of the "stalking horse" theory. To decide this appeal on that ground, we would have to assume *arguendo* that this ill-defined theory exists and then decide whether its parameters exclude the facts presented in this case. Rather than hypothetically construct the theory and then limit the parameters of the hypothetical theory, we apply Occam's razor and decide that the doctrine is not a valid defense in this Circuit.

A probation officer is responsible for ensuring that a convicted person serving a term of federal supervised release is not violating the conditions of his supervised release, which includes verifying whether the supervisee is dealing in drugs or committing other crimes. *See* 18 U.S.C. §§ 3603(2), (4); Supervision of Federal Offenders, at 57–58. Law enforcement officers are yoked with similar responsibilities to root out crime in the public at large. Accordingly, the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined. Indeed, it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities,[12] would not be pursuing legitimate supervised release objectives. *See United States v. Martin,* 25 F.3d 293, 296 (6th Cir.1994) ("[P]olice officers and probation officers can work together and share information to achieve their objectives."); *McFarland,* 116 F.3d at 318 (stating that "[p]arole and police officers may work together ... provided the parole offi-

---

12. In the instant case, there is no suggestion that DEA Special Agent Abrams provided false information about Reyes's activities. Nevertheless, we note that our rejection of the "stalking horse" theory does not address the actions of a law enforcement officer who— unbeknownst to the probation officer—intentionally provides false information about a supervisee's activities in the hope of instigating a home visit by the probation officer that would yield incriminating evidence to prosecute the supervisee.

cer is pursuing parole-related objectives"); *Watts*, 67 F.3d at 794 (approving of probation officer's enlistment of police officers to assist his own legitimate objectives). Consequently, the notion of the "stalking horse" stands in stark contrast to the law governing the long-established practices of probation and parole officers.

■ Even assuming, only for the sake of argument, that there is some merit in the "stalking horse" theory, the conduct of the probation officers here was clearly proper. The District Court stated,

> "The stalking horse defense ... doesn't apply in this case where the agency going in had a clear duty to make home visits and was lawfully there for that purpose. Even though there may have been some other involvement of the agency at the time, it doesn't appear to me that that was the primary purpose."

(Suppression Hr'g Tr. of 10/2/00, at 146.) Reviewing this factual determination for clear error, *McFarland*, 116 F.3d at 318; *Watts*, 67 F.3d at 794, we hold that Judge McAvoy's conclusion that the probation officers did not act as a "stalking horse" was entirely sound.

First, the conditions of Reyes's supervised release permitted home visits "at any time" by a probation officer. Conditions of Prob. and Supervised Release for Donald Reyes, United States Dist. Ct. for the Dist. of N.N.Y., 5/12/98, at 2. In fact, Reyes was overdue for a home visit, since two prior attempts to visit him had been unsuccessful. Second, probation officers are charged with monitoring a supervisee's adherence to the conditions of his release, *see* 18 U.S.C. §§ 3603(2), (4); Storm, *ante*, at 17, which includes the requirement that the supervisee not commit further crimes, 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(1). Third, it was "efficient," as Watts testified, to coordinate this visit with the DEA's search of the residence next door to ensure that if Reyes was violating the conditions of release, Probation would discover it before the search next door spurred Reyes to destroy the evidence. (Suppression Hr'g Tr. of 10/2/00, at 18.) Fourth, Probation Officer Watts made clear to DEA Special Agent Abrams the Probation Office's "parameters" for home visits, further explaining that the probation officers would "do the home visit within [their] own format," even though they would coordinate their visit with the DEA's search of Posniewski's residence. (*Id.* at 18.)

■ While the search at Posniewski's home and the visit at Reyes's home next door were conducted as a "coordinated effort" between the agencies (*id.* at 21), the law permits such cooperation as long as the probation officers are pursuing legitimate probation-related objectives, *United States v. Giannetta*, 909 F.2d 571, 581 (1st Cir.1990) ("Nor is mutually beneficial cooperation between probation officers and other law enforcement officials precluded."); *Martin*, 25 F.3d at 296 ("[P]olice officers and probation officers can work together and share information to achieve their objectives."); *McFarland*, 116 F.3d at 318; *Watts*, 67 F.3d at 794; Adair, *ante*, at 71. In fact, "the authoritative standard for the supervision of Federal offenders" directs probation officers to "make frequent contact with those law enforcement agencies that may have information about the activities of the offender." Supervision of Federal Offenders, at 1, 28. Probation officers are instructed that "[c]lose coordination with local law enforcement can ... expand the network of data sources available...." *Id.* at 28. To that end, probation officers are quite properly advised that "[t]he original arresting agency and Federal task forces are good sources of information about an offender's previous criminal activities and associates *and can provide valuable assistance to the officer in monitoring the of-*

*fender's activities while under supervision." Id.* (emphasis added).

In sum, even if we adopted the "stalking horse" theory that we now reject, the collaboration between probation officers and law enforcement officers was clearly permissible on the facts of this case. *Cf. McFarland,* 116 F.3d at 318 (deferring to district court's determination that parole officer did not act as a "stalking horse" where she was concerned that parolee was violating a condition of parole; was contacted by police seeking permission to search the parolee's residence; and authorized a residence search that was conducted out of her presence and a rented storage locker search that was executed in her presence that were physically carried out by police officers); *Watts,* 67 F.3d at 794 (deferring to district court's determination that the probation officer, not the police with whom he collaborated, "decided to conduct the probation search" and holding that "the district court's ... conclusion that [the probation officer] 'was calling the shots' and that he was motivated by the legitimate objectives of the probation system is not clearly erroneous").

### D. Application of Traditional Fourth Amendment Analysis to the Probation Officer's Actions

 Even if we assume for the sake of argument that the probation officers in this case acted solely on behalf of the DEA—which, it may be argued, requires us to treat the probation officers as law enforcement officers and to apply traditional Fourth Amendment analysis to their actions—Reyes's arguments in support of his motion to suppress are still unavailing. Since "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense," when "police take that route 'for the purpose of making a general inquiry' or for some other legitimate reason, they are 'free to keep their eyes open'...." 1

WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(e), at 499 (3d ed.1996) (footnotes omitted); *see also United States v. Reed,* 733 F.2d 492, 501 (8th Cir.1984) ("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways."). Furthermore, we have held that "driveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses." *United States v. Reilly,* 76 F.3d 1271, 1279 (2d Cir.1996) (quoting *Krause v. Penny,* 837 F.2d 595, 597 (2d Cir.1988)) (internal quotation marks omitted). Accordingly, we have found no Fourth Amendment violation based on a law enforcement officer's presence on an individual's driveway when that officer was in pursuit of legitimate law enforcement business. *See Krause,* 837 F.2d at 596 (after investigating criminal mischief complaint, New York State Trooper lawfully entered driveway to arrest plaintiff who stood in driveway speaking to another officer).

Several other circuits have reached similar conclusions regarding the accessible, semi-private nature of driveways and the propriety of law enforcement officers entering such driveways in the course of conducting legitimate law enforcement activities. *See Rogers v. Vicuna,* 264 F.3d 1, 2–3, 5 (1st Cir.2001) (no reasonable expectation of privacy in a driveway visible to the occasional passerby) (IRS agents lawfully entered taxpayer's driveway pursuant to valid tax collection levy to seize vehicles parked there); *United States v. Roccio,* 981 F.2d 587, 589, 591 (1st Cir.1992) (no expectation of privacy in a driveway that is exposed to the public) (IRS agents lawfully entered taxpayer's driveway pursuant to valid tax collection levy to seize vehicles

parked there); *United States v. Smith,* 783 F.2d 648, 649–50, 651, 652 (6th Cir. 1986) (no reasonable expectation of privacy in driveway accessible and visible from public highway) (Kentucky State Police detective lawfully drove seventy-five to one hundred yards up defendant's unobstructed driveway to investigate informant's tip that a large· marijuana plant was growing by front door of defendant's home before applying for a state search warrant); *United States v. Evans,* 27 F.3d 1219, 1222–23, 1228–29 (7th Cir.1994) (no reasonable expectation that members of the public or FBI agents would refrain from entering defendant's driveway where there was no evidence that the public had limited access to the driveway) (FBI agents lawfully entered driveway in the course of following suspected car thieves to disposal location); *United States v. Ventling,* 678 F.2d 63, 64, 66 (8th Cir.1982) (no reasonable expectation of privacy in residential driveway and area around front porch where observations by United States Forest Service Special Agent were made in public view and driveway was accessible to and from public highway) ("[A] driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view.") (United States Forest Service Special Agent lawfully entered defendant's driveway to inquire about suspicious tire tracks leading to residents' home); *United States v. Singer,* 687 F.2d 1135, 1144 n. 17 (1982) ("We do not believe that people have the same expectations of privacy in their driveways as in ' their homes. In the course of everyday life we expect members of the public—salesmen, children, or even strangers looking for an address—to enter upon a driveway.") (police officer lawfully entered onto defendants' premises to investigate a reported burglary in progress), *rev'd on other grounds,* 710 F.2d 431 (8th Cir.1983) (*en banc* ); *Maisano v. Welcher,* 940 F.2d 499, 503 (9th Cir.1991) ("In order

to establish a reasonable expectation of privacy in [one's] driveway, [an individual] must support that expectation by detailing the special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it.") (IRS agents lawfully entered taxpayer's driveway pursuant to valid tax collection levy to seize vehicle parked there); *United States v. Humphries,* 636 F.2d 1172, 1179 (9th Cir.1980) (Arizona state police officer in Narcotics Enforcement Division lawfully entered unenclosed driveway to check license plate number of parked car that was visible from street and previously stopped by a law enforcement agent near crash site of a marijuana-loaded airplane); *United States v. Magana,* 512 F.2d 1169, 1170–71 (9th Cir.1975) ("A driveway is only a semiprivate area.") (police officers lawfully turned into defendant's driveway in course of providing security for undercover agents effecting arrest of a narcotics dealer at residential location; citing "officers' reasons for being on the driveway" as one factor in Fourth Amendment reasonableness analysis); *cf. Katz,* 389 U.S. at 351, 88 S.Ct. 507 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

▮ The District Court in the instant case found that the gravel-covered area upon which USPO Watts and NYS Parole Officer Smith walked, and from which they viewed the outdoor marijuana plants, was "clearly a driveway with access for pedestrian traffic." (Suppression Hr'g Tr. of 10/2/00, at 145.) Although there was a chain to prevent vehicles from entering the driveway, there were no signs forbidding pedestrian access. *Cf. United States v. Raines,* 243 F.3d 419, 421 (8th Cir.2001) (no Fourth Amendment violation when deputy sheriff entered onto curtilage of defendant's home where no signs or barri-

ers forbidding trespass were located at ten-foot-wide opening in a makeshift fence of debris encircling property); *Ventling*, 678 F.2d at 66 (no Fourth Amendment violation by United States Forest Service Special Agent who entered publicly visible driveway where defendant had posted "no trespassing" signs but did not maintain a locked or closed gate). Moreover, the aerial photographs of the Reyes home and vicinity that are in the record show that the driveway was not secluded in any manner. The driveway led to the street and could be viewed in its entirety from the street. In addition, there is no evidence in the record suggesting, much less showing, that the driveway was used for activities of an intimate nature. *Oliver v. United States*, 466 U.S. 170, 179, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (observing that the Fourth Amendment is intended to shelter "intimate activities" from government interference or surveillance); *see also Smith*, 783 F.2d at 652 ("Growing large [marijuana] plants in a totally unobstructed and open area is not one of those 'intimate activities' whose presence defines the curtilage for Fourth Amendment purposes.") In these circumstances, Reyes had only a diminished expectation of privacy in the driveway where the officers stood and from where they discovered his outdoor marijuana plants in the yard's vegetation. *See id.* at 651, 652 (no violation of right to privacy when state police officer entered driveway and proceeded to area of residence where driveway was unobstructed and marijuana plants growing near front porch were not screened off or enclosed).

■ Accordingly, even if probation officers were held to the standards applicable to police officers—standards that we do not regard as applicable to probation officers—the probation officers in this case acted entirely appropriately. Here, the probation officers walked onto Reyes's driveway in the course of attempting a

court-imposed home visit, and it was during the pursuit of this legitimate activity that they observed the marijuana plants in Reyes's yard. *See Raines*, 243 F.3d at 421 (recognizing "that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence" and finding that deputy sheriff did not interfere with defendant's "privacy interest when he, in good faith, went unimpeded to the back of [defendant's] home to contact the occupants of the residence" to serve civil process); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir.1977) ("We cannot say that the [federal law enforcement] agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."); *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence."); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir.1990) ("[I]f [the front] door is inaccessible[,] there is nothing unlawful or unreasonable about [a state police officer] going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person.").

As for the DEA agents themselves, they did not enter Reyes's driveway until the probation officers notified them that contraband had been discovered in plain view.

■ In these circumstances, there was nothing inappropriate, much less unconstitutional, about the probation officers' entry onto the driveway or the subsequent entry of the DEA agents. Because of the need effectively to monitor Reyes as a convicted person serving a term of federal supervised release, it was reasonable for probation officers attempting a court-mandated

home visit to walk along Reyes's driveway in an attempt to ascertain if he was at home. This was particularly appropriate where there were indications that he was on the premises. As the District Court correctly observed, "when somebody is subject to home visits, somebody goes to the house to find out if somebody is home[.] [A probation officer] certainly would at least walk around to the side or the back of the house in an attempt to find if somebody was there, [and] maybe knock on the back door." (Suppression Hr'g Tr. of 10/2/00, at 145.)

### E. Seizure by Probation Officers of Contraband in Plain View

█ "Contraband that falls within the plain view of a probation officer who is justified [in] being in the place where the contraband is seen may properly be seized by the probation officer," if it is "immediately apparent that the item is contraband with respect to the supervisee." Committee on Criminal Law of the Judicial Conference of the United States, MODEL SEARCH AND SEIZURE GUIDELINES (1993), at VII, *reprinted in* Supervision of Federal Offenders, app. C, at 6; *cf. United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999) ("Under the 'plain view' exception [to the warrant requirement], 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'") (quoting *Minn. v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). That is, "[a]n item that is ... observed in plain view may be seized if the probation officer has reasonable grounds to believe that the item is contraband or constitutes evidence of a violation of a condition of release." MODEL SEARCH AND SEIZURE GUIDELINES (1993), at VII, *reprinted in* Supervision of Federal Offenders, app. C, at 6.

█ Having established that the probation officers were lawfully standing in Reyes's driveway, the "plain view" doctrine applies. Here, the probation officers simply glanced around the yard and spotted the illicit marijuana—at which point they were lawfully authorized to seize the plants. *Cf. Raines*, 243 F.3d at 421 (finding marijuana plants were in plain view when observed by deputy sheriff proceeding to back of defendant's home to serve civil process); *Hammett*, 236 F.3d at 1060–61 (finding marijuana plants were in plain view when observed by police officers circling home to locate occupants).

### F. Probation Officers May Call Upon Law Enforcement Agents to Seize Contraband

█ In this case, the marijuana plants were seized by DEA agents (Suppression Hr'g Tr. of 10/2/00, at 109, 112), rather than by the probation officers who lawfully observed the plants in "plain view" (*id.* at 146) and who were themselves authorized to seize the plants. This course of action was chosen under the commonsensical search and seizure *policy* for probation officers in the Northern District of New York—as established by the United States District Court for the Northern District of New York—which instructs,

When contraband is observed within the "plain view" of a probation officer during ... [a] home visit ..., such contraband may be seized *only* if in the officer's judgment, it would present an immediate danger to the officer or the community. In consideration of officer safety, *the preferred and more prudent* action would be for the officer to leave the premises and immediately notify (by cellular phone, if necessary) a supervisor of his observations. The officer will then notify the appropriate law enforcement agency as directed by the supervi-

sor.... Officers should avoid seizing apparent controlled substances (drug or drug paraphernalia) but should notify [a] supervisor and *law enforcement agency* as soon as possible.

(Mem. from Paul W. DeFelice, Chief USPO for N.D.N.Y., approved by then-Chief Judge Thomas J. McAvoy, to All USPOs for N.D.N.Y. of 11/18/94, at 2 (regarding district policy on search and seizure) (emphases added); *see also* Suppression Hr'g Tr. of 10/2/00, at 36). Under the "plain view" exception applicable here, the probation officers conducting the home visit, we repeat, were fully authorized to seize the marijuana plants themselves, though they elected *as a matter of policy and prudence* to have the DEA agents seize the contraband, thereby shortening the chain of custody and leaving the seizure to law enforcement officers who are expert in such rough-and-tumble situations. In essence, the DEA agents simply *substituted* for the probation officers for the purpose of physically seizing the drugs. Consideration of the role of probation officers, and the guidelines under which they operate, makes it clear why this arrangement was entirely proper.

The search and seizure policy for the Probation Office of the Northern District of New York, directing probation officers, as a matter of policy and prudence, to leave drug seizures to law enforcement authorities (Mem. from Paul W. De Felice, Chief USPO for N.D.N.Y., approved by then-Chief Judge Thomas J. McAvoy, to All USPOs for N.D.N.Y. of 11/18/94, at 2 (regarding district policy on search and seizure); *see also* Suppression Hr'g Tr. of 10/2/00, at 36), comports with "the policy of conservative use of searches and seizures by federal probation officers embodied in the 'Model Search and Seizure Guide-lines,'" which were drafted and approved by the Committee on Criminal Law of the Judicial Conference of the United States (the "Committee"). David N. Adair, Jr., *Probation Officer Searches*, 62 Fed. Probation 68, 68 (June 1998). The "various provisions [of those guidelines] are based upon considerations of the role, responsibilities, authority, and training of United States probation officers," including the "limited law enforcement authority of probation officers ... and the limited training and experience in ... law enforcement techniques available to probation officers." *Id.* at 68–69. For "[w]hile probation officers are law enforcement officers for some purposes ...], they do not possess the full powers and responsibilities of investigation, detection, and public safety that police officers possess." *Id.* at 70. Accordingly, the Committee found that "the use of intrusive searches and seizures" were far less "befitting United States probation officers' traditional role" than the use of other techniques for supervision. *Id.* at 69. In addition, probation officers are explicitly instructed that, as a matter of safety, "[s]ometimes it may be necessary for [a probation] officer to request that a federal, state, or local law enforcement authority accompany the officer on a field contact." X Guide to Judiciary Policies and Procedures, Probation Manual, ch. V, *Safety*, at 5–7 (12/16/96). In sum, "[t]he assistance of other law enforcement officers for protection ... and for taking possession of contraband is appropriate and recommended." Adair, *ante*, at 71.

While regular law enforcement officers are not empowered to conduct the visits that probation officers are required to make to the homes of convicted persons serving federal terms of supervised release,[13] it is entirely appropriate for law

---

**13.** It bears recalling, however, that in at least one jurisdiction—California—a regular law enforcement officer is permitted to conduct searches of a probationer's "person, property, place of residence, vehicle, [and] personal ef-

enforcement officers providing support for a home visit "to be on the scene"—a role that is "predicated upon the probation officers' more limited law enforcement authority." *Id.* Accordingly, once probation officers observe contraband in plain view on a home visit, regular law enforcement officers, such as local or state police or other federal agents, may be called upon to seize the drugs in the place of the probation officers who, as a matter of prudence and as a matter of policy, refrain from seizing the evidence themselves—though they are fully empowered to do so under the law—and instead consign their seizure authority to law enforcement officers at the scene by notifying them of the discovery.

Simply stated, there is nothing improper about a probation officer adopting a more modest or cautious approach to seizures than is actually permitted by law—one that permits probation officers to rely on law enforcement officers to take hold of the contraband or, indeed, to arrest the person under supervision.[14]

■■■■■ We take this opportunity to recall our holding that "there is no 'inadvertent discovery' limitation on the plain view doctrine." *Bradway v. Gonzales,* 26 F.3d 313, 318 (2d Cir.1994). The doctrine is not limited to cases where a probation officer or law enforcement agent stumbles upon an object in plain view or inadvertently discovers evidence in plain view. The fact that the probation officers and the DEA suspected that Reyes might have violated the terms of his supervised release and were interested in determining whether Reyes possessed marijuana plants and growing apparatuses (and suspected that

they might find these items in the course of a home visit) does not cast the slightest doubt on the lawfulness of the seizure of the plants. *Id.*

### G. The Exclusionary Rule in Supervised Release Revocation Hearings

Having concluded that the District Court properly denied Reyes's motion to suppress, we do not reach the government's contention that, in light of *Pennsylvania Board of Probation and Parole v. Scott,* 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998), the evidence found during the home visit should not be subject to the exclusionary rule for purposes of Reyes's federal supervised release revocation hearing.

### III.

To summarize our holdings:

1. The United States Probation Office functions as a legally constituted arm of the judicial branch, with federal probation officers serving both as confidential advisors to, and officers of, the United States District Court. *See United States v. Inserra,* 34 F.3d 83, 88 (2d Cir.1994); *see also* 18 U.S.C. § 3602(a).

2. Federal probation officers overseeing convicted persons serving terms of federal supervised release are charged with monitoring a supervisee's adherence to the conditions of his release, *see* 18 U.S.C. §§ 3603(2), (4), which includes the requirement that the supervisee not commit further crimes, 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(1).

---

fects ... at anytime, with or without a search warrant, warrant of arrest or reasonable cause," provided that such searches are authorized by a known condition of probation and supported by reasonable suspicion. *United States v. Knights,* 534 U.S. 112, ——, 122 S.Ct. 587, 589, 593, 151 L.Ed.2d 497 (2001).

**14.** We recognize, of course, that a probation officer is empowered by law to arrest a probationer or a convicted person serving a term of supervised release, with or without a warrant, "[i]f there is probable cause to believe that [the offender] has violated a condition of his probation or release." 18 U.S.C. § 3606.

3. A United States probation officer conducting a court-imposed *home visit* of a convicted person serving a term of federal supervised release is not subject to the probable cause requirements of the Fourth Amendment that would ordinarily apply to law enforcement officers executing a search warrant for an individual's home, *Griffin v. Wisconsin*, 483 U.S. 868, 878, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), or subject to the reasonable suspicion standard applicable to *probation searches* under *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).

4. A convicted person serving a term of federal supervised release has a severely diminished expectation of privacy, making it reasonable and lawful for probation officers to walk on the supervisee's driveway during a required home visit and observe what they may in plain view.

5. While a probation officer legally may seize contraband observed in plain view during a home visit, the probation officer may also consign his seizure authority to other law enforcement officers at the scene by notifying them of the discovery.

6. The so-called "stalking horse" theory does not exist as a matter of law, since the objectives and duties of probation officers and law enforcement personnel are often parallel and frequently intertwined. Accordingly, the law permits cooperation between probation officers and other law enforcement officials so that they may work together and share information to achieve their objectives.

Accordingly, the order of the District Court denying defendant Reyes's motion to suppress is affirmed.